# ORIGINAL



1  Patrick J. Reilly, Esq.
   Nevada Bar No. 6103
2  Hale Lane Peek Dennison and Howard
   2300 West Sahara Avenue
3  Suite 800, Box 8
   Las Vegas, Nevada 89102
4  Telephone (702) 222-2500
   Facsimile (702) 365-6940
5
   Robert J. Itri, Esq. (010938)[1]
6  Brian W. LaCorte, Esq. (012237)
   Gallagher & Kennedy, P.A.
7  2575 East Camelback Road
   Phoenix, Arizona 85016-9225
8  Telephone (602) 530-8000
   Facsimile (602) 530-8500
9
   *Attorneys for Plaintiff SWA, L.L.C.*
10

11            **UNITED STATES DISTRICT COURT**

12              **DISTRICT OF NEVADA**          CV-S-02-1701-KJD-PAL

13  SWA, L.L.C., a Nevada limited liability
    company,
14
                 Plaintiff,              **COMPLAINT   FOR   DECLARATORY
15                                        JUDGMENT**
         vs.
16                                        **DEMAND FOR JURY TRIAL**
    RURAL/METRO CORPORATION, a Delaware
17  corporation,
18
                 Defendant.
19  _____/
20
         Plaintiff SWA, L.L.C. ("SWA") hereby alleges as follows:
21
                **PARTIES, JURISDICTION, AND VENUE**
22
         1.      This is an action seeking declaratory judgment pursuant to the Federal Declaratory
23
    Judgment Act, 28 U.S.C. §§ 2201 & 2202, common law trademark non-infringement and trademark
24
    non-dilution, and non-violation of prohibition on unfair competition, 15 U.S.C. § 1125, and non-
25
    breach of a License Agreement. SWA also seeks injunctive relief prohibiting Rural/Metro's imminent,
26
    wrongful termination of the License Agreement.
27
28          [1] Mr. Itri and Mr. La Corte are in the process of preparing their respective *pro hac vice* applications, which will be
    filed with this Court in short order.

::ODMA\PCDOCS\HLLASDOCS\158412\1          Page 1 of 12

2.      This Court has jurisdiction over the matters asserted herein under 28 U.S.C. §§ 1331, 1338, 1367 and 2201.

3.      Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(b) and (c).

4.      Plaintiff SWA is a Nevada limited liability company.  SWA owns 100% of the issued and outstanding shares of Southwest Ambulance of Nevada, Inc., a Nevada corporation ("SWA-Nevada").  SWA-Nevada is the majority shareholder of Southwest Ambulance-Las Vegas, Inc., a Nevada corporation with its principal place of business located at 4640 South Arville, Suite G, Las Vegas, Nevada 89103 ("SWA-Las Vegas").

5.      SWA-Las Vegas provides 911 emergency and non-emergency ambulance transportation, non-emergency advanced life support and basic life support transports and critical care transports.  SWA-Las Vegas services the residents of Clark County, Nevada, Las Vegas, and North Las Vegas pursuant to franchise agreements with such governmental entities.

6.      Defendant Rural/Metro is a Delaware corporation and provides 911 emergency and non-emergency ambulance and alternative transportation services to various communities throughout the United States.  By virtue of its non-compete with Plaintiff, Defendant Rural/Metro does not and can not separate such services in the state of Nevada.

7.      Rural/Metro has significant contacts with the State of Nevada and has availed itself of Nevada's laws.  Moreover, Rural/Metro has taken and/or threatened to take various acts which are directed towards and will cause injuries to the citizens of the State of Nevada, including SWA, SWA-Nevada, SWA-Las Vegas and the various communities served by SWA in the State of Nevada.

## GENERAL ALLEGATIONS

### *The License Agreement.*

8.      On or about August 31, 2000, SWA and Rural/Metro entered into a Stock Purchase Agreement pursuant to which SWA agreed to purchase and Rural/Metro agreed to sell all the issued and outstanding shares (the "Shares") of Rural/Metro of Nevada, Inc. ("Rural/Metro-Nevada"), a wholly-owned and operated subsidiary of Rural/Metro and a provider of emergency and non-emergency ambulance transportation services for Clark County, Nevada and the Cities of North Las

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

1 │ Vegas and Las Vegas, in consideration for the sum of $1,000,000. A true and correct copy of the

2 │ Purchase Agreement (without exhibits) is attached hereto as **Exhibit "1"**.

3 │       9.     As of August 31, 2000, Rural/Metro-Nevada held a minority interest in, and had the

4 │ right to acquire a majority interest in, SWA-Las Vegas, which was in the process of obtaining approval

5 │ from the City of Las Vegas and Clark County, Nevada to operate an ambulance service.

6 │       10.    In accordance with the terms of the Stock Purchase Agreement, the closing of the

7 │ transactions contemplated therein, including SWA's payment of the $1,000,000 purchase price was

8 │ subject to the satisfaction of certain conditions, which conditions included (a) SWA's or SALV's

9 │ obtaining approval from the City of Las Vegas and Clark County, Nevada to operate an ambulance

10 │ service in those jurisdictions (the "Franchise Approvals"); and (b) the execution of a License

11 │ Agreement between SWA and Rural/Metro with respect to SWA's use of certain trademarks and/or

12 │ tradenames.

13 │       11.    Pursuant to the Purchase Agreement, the closing of the sale of the Shares was to take

14 │ place as soon as reasonable after the satisfaction of all conditions precedent to closing, but in no event

15 │ later than October 30, 2000 (the "Closing"). The period between execution of the Purchase Agreement

16 │ and the Closing is hereafter referred to as "the Contingency Period."

17 │       12.    By agreement, the parties extended the Contingency Period and Closing up to and

18 │ through January 26, 2001.

19 │       13.    Pursuant to Article 1.1(a) of the License Agreement, Rural/Metro granted SWA a

20 │ royalty free, exclusive and irrevocable right and license to use, among other common law trademarks

21 │ and/or tradenames, the mark "Southwest Ambulance" for a period of fifty (50) years, solely in

22 │ connection with the conduct of its ambulance transportation services within the State of Nevada. A

23 │ copy of the License Agreement is attached hereto as **Exhibit "2"**.

24 │ / / /

25 │ / / /

26 │ / / /

27 │ / / /

28 │ / / /

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

14. Pursuant to Article 1.1(h) of the License Agreement, Rural/Metro specifically excluded from its grant of license to SWA, and SWA specifically agreed not to use the following logo (the "R/M Logo"):



15. The License Agreement does not prohibit or otherwise restrict SWA from sublicensing the use within the State of Nevada of the Southwest Ambulance mark to SWA-Nevada, SWA-Las Vegas or any other party.

16. Rural/Metro does not hold federal registrations for the marks "Southwest Ambulance" or the R/M Logo and does not make use of such mark or logo outside the State of Arizona. *See* p. 7 of Rural/Metro 10-K/A dated June 30, 2002, a copy of which is attached hereto as **Exhibit "3"**.

17. Article 7.1 of the License Agreement provides, in pertinent part, as follows:

> **7.1   Events of Termination.**  This Agreement shall terminate automatically upon the occurrence of a Material Breach.  It shall be a "Material Breach" if [SWA] fails to cure a default within thirty (30) days following receipt of written notice of such default.  For purposes of this Agreement, it shall be a default if [SWA]:
>
> **(a)**   conducts any portion of its business or uses any of the Licensed Assets in a manner that [Rural/Metro] believes threatens the validity or integrity of any of the Licensed Assets or threatens the goodwill associated therewith;
>
> . . . .

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

**(c)**    fails or refuses to comply with any other provision of this
Agreement or any instruction of Licensor concerning use
of the Licensed Assets; or

18.    Throughout the Contingency Period, Rural/Metro, through its subsidiary Rural/Metro-Nevada, continued to operate the ambulance transportation business. During such time, in order to permit SWA-Las Vegas to immediately commence operations under the Southwest Ambulance trademark at the time of the Closing, SWA-Las Vegas, with the knowledge, consent, and/or acquiescence of Rural/Metro, commenced use of the Southwest Ambulance mark and the following logo (the "SWA Logo"):



19.    Moreover, on or about the commencement of the Contingency Period, SWA-Las Vegas commenced operating a website at the web address *www.southwestambulance.com* (the "SWA Website").

20.    The SWA Website is, and has since its inception been continually operated as, a passive website and is intended to provide information about SWA-Las Vegas' services to the residents of the jurisdictions which it services. The SWA Website is not purposefully directed to any person or forum outside of the State of Nevada. Moreover, a banner identifying the website operator and provider of services as Southwest Ambulance-Las Vegas appears prominently at the top of each page of the SWA Website. A true and correct copy of the SWA Website is attached hereto as **Exhibit "4"**.

21.    On or about January 26, 2001, upon the satisfaction and/or waiver of all conditions precedent, including, SWA-Las Vegas' procurement of the Franchise Approvals and execution of the License Agreement, Rural/Metro and SWA closed upon transfer of the Shares to SWA and, subsequently, SWA remited the sum of $1,000,000 to Rural/Metro.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

22.   On or about the Closing, Rural/Metro-Nevada changed its name to SWA-Nevada. Thereafter, SWA-Nevada acquired a majority interest in SWA-Las Vegas.

23.   At all relevant times, SWA and its affiliates limited commercial use of the "Southwest Ambulance" mark and SWA Logo to the State of Nevada.

24.   Upon information and belief, Rural/Metro subscribes to, and at all relevant times subscribed to, a trademark watch service, actively policing the use of its trademarks and tradenames.

25.   Upon information and belief, Rural/Metro has had knowledge about the above referenced website since its inception and has not objected to SWA-Las Vegas' use of the domain name *www.southwestambulance.com*.

26.   By letter dated November 20, 2002, Rural/Metro, through its counsel, served written notice on SWA alleging SWA had committed a series of defaults under the License Agreement and threatened to terminate the License Agreement on December 26, 2002, if such alleged defaults were not cured (the "Termination Notice").

27.   The alleged defaults that Rural/Metro contends SWA committed are (1) use of a "knockoff" of the R/M logo; (2) use of the Southwest Ambulance mark outside the State of Nevada; (3) registration of the tradename "Southwest Ambulette" in Arizona; and (4) registration of the domain name *www.southwestambulance.com*. A true and correct copy of the Termination Notice is attached hereto as **Exhibit "5"**.

28.   By letter dated December 4, 2002, counsel for SWA responded to the Termination Notice and denied that SWA committed any defaults under the License Agreement (the "Response Letter"). A copy of the Response Letter is attached hereto as **Exhibit "6"**.

29.   In the Response Letter, SWA specifically stated that (1) the SWA Logo was adopted and used by SWA-Las Vegas prior to the Closing with the knowledge of Rural/Metro; (2) SWA undertook specific efforts to distinguish the SWA Logo, and did distinguish the SWA Logo, from the R/M Logo; (3) SWA has received no indication of actual confusion in any context concerning the SWA Logo or SWA's use of the mark "Southwest Ambulance;" (4) SWA only operates its business services within the State of Nevada; (5) SWA and its affiliates cannot provide ambulance transportation services outside the State of Nevada absent government approval, which approval it has

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

1    not sought; and (6) SWA-Las Vegas has operated the SWA Website under the domain name and web

2    address *www.southwestambulance.com* for a period of two and one-half years without objection from

3    Rural/Metro.

4        30.    By letter dated December 12, 2002, a true and correct copy of which is attached hereto

5    as **Exhibit "7"**, Rural/Metro rejected the position asserted and offer of compromise contained in the

6    Response Letter and reiterated its threat to terminate the License Agreement as of December 26, 2002.

7        31.    Although under no legal obligation to do so, in an effort to address the concerns raised

8    by Rural/Metro in the Termination Letter 1) on or about December 1, 2002, SWA-Las Vegas moved

9    its website to the web address *www.swalv.com* and redirects all Internet traffic from

10   *www.southwestambulance.com* to such new web address; and 2) by letter dated December 19, 2002,

11   advised Rural/Metro of SWA's intent to adopt and use a completely new logo in connection with its

12   ambulance transportation services within the next ninety (90) days.  A copy of the December 19, 2002

13   letter is attached hereto as Exhibit "H".  SWA also directed Rural/Metro's counsel to public records

14   confirming that SWA  neither owns nor controls the Arizona tradename registration for "Southwest

15   Ambulette".

16       32.    SWA, SWA-Nevada and SWA-Las Vegas have never registered or had registered on its

17   behalf the tradename "Southwest Ambulette."

18       33.    Since the Closing, SWA has expended substantial time and money in promoting its

19   services and those of its affiliates under the SWA marks within the State of Nevada.  As a consequence

20   thereof, SWA has developed a substantial degree of recognition and goodwill within the communities

21   it services.

22       34.    Rural/Metro's threats raise a reasonable apprehension in SWA that Rural/Metro will

23   terminate the License Agreement on December 26, 2002, and/or initiate trademark, unfair competition,

24   and contract litigation claims against SWA and its affiliates.

25       35.    There is an actual and justiciable controversy between SWA and Rural/Metro regarding

26   Rural/Metro's right to terminate the License Agreement and its claims of breach of contract, trademark

27   infringement, and unfair competition.

28

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

36.     Rural/Metro's conduct and threatened actions pose an immediate threat of irreparable harm to SWA, its business and goodwill.  Moreover, Rural/Metro's conduct and threatened actions pose an immediate threat to the health and safety of the residents living in those jurisdictions serviced by SWA and its affiliates given that termination of the License Agreement and right to use the Southwest Ambulance mark may result in 1) the revocation or suspension of SWA-Las Vegas' license to operate ambulance transportation services pending government approval of a name change; and 2) confusion among emergency response personnel, including police, firemen, EMT's and Emergency Room personnel.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief of Non-Infringement and Non-Dilution of Common Law Trademark)

37.     SWA repeats and realleges Paragraphs 1 through 36 as though set forth fully herein.

38.     Rural/Metro claims common law trademark rights to the Southwest Ambulance mark and the R/M Logo in connection with ambulance transportation services.

39.     Rural/Metro further claims that the Southwest Ambulance mark and R/M Logo are famous marks in the State of Arizona.

40.     Rural/Metro claims that SWA's and its affiliates' use of the Southwest Ambulance mark and SW Logo, as described above, infringe on Rural/Metro's trademark rights and dilute the distinctive quality of Rural/Metro's marks in the State of Arizona by exceeding the scope of the License Agreement and by virtue of the use of an allegedly confusingly similar logo.

41.     SWA's and its affiliates' use of the mark of Southwest Ambulance and the SWA Logo is not likely to cause confusion, cause mistake or to deceive the public as to the source or origin of SWA's and its affiliates' products.  Moreover, SWA's use of the Southwest Ambulance mark and the SW Logo does not dilute and is not likely to dilute the distinctive quality of Rural/Metro's marks within the State of Arizona.

42.     SWA and its affiliates' use of the Southwest Ambulance mark and the SWA Logo was not done with the intent to cause confusion, cause mistake or to deceive the public as to the source or origin of SWA's or its affiliates' services.

43.     SWA is entitled to a declaration of non-infringement and non-dilution of trademark.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

44.     This is an exceptional case, entitling SWA to recover its reasonable attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF

### (Non-Violation of Prohibition on Unfair Competition, 15 U.S.C. § 1125)

45.     SWA repeats and realleges Paragraphs 1 through 44 as though set forth fully herein.

46.     Rural/Metro claims that the above allegations of trademark infringement and trademark dilution also constitute unfair competition.

47.     Neither SWA's or its affiliates' use of the Southwest Ambulance mark or the SW Logo have a tendency to deceive or confuse consumers into believing that some or all of SWA's or its affiliates' services originate with or are affiliated with Rural/Metro or otherwise associated with Rural/Metro.

48.     SWA and its affiliates have not made, and are not making, any false, deceptive or misleading statements constituting false representations and false advertising in connection with any services distributed in interstate commerce in violation of 15 U.S.C. § 1125(a).

49.     SWA is entitled to a declaration that SWA and its affiliates have not, and are not, engaging in unfair competition under 15 U.S.C. § 1125(a) or any state or federal law.

50.     This is an exceptional case, entitling SWA to recover its reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

### (Nonbreach of License Agreement)

51.     SWA repeats and realleges Paragraphs 1 through 50 as though set forth fully herein.

52.     As more specifically set forth above, and in the Termination Notice, Rural/Metro has alleged that SWA has committed defaults under the License Agreement permitting it to terminate the License Agreement for material breach on December 26, 2002.

53.     SWA denies that it has committed any defaults under the License Agreement and asserts that (1) SWA and its affiliates have limited trademark use of the Southwest Ambulance mark and SWA Logo to the State of Nevada; (2) the SWA Logo is dissimilar to and distinctive from the R/M Logo; and (3) SWA's and its affiliates' use of the SWA Logo and

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

1   *www.southwestambulance.com* domain name has been made with the full knowledge, consent and/or

2   acquiescence of Rural/Metro.

3      54.   SWA is entitled to a declaration that it has not committed an event of default under the

4   License Agreement and that Rural/Metro is not entitled to terminate the License Agreement in

5   accordance with the terms of the Termination Notice.

6      55.   Pursuant to the License Agreement and Arizona law, SWA is entitled to its attorneys'

7   fees and costs expended in enforcing its rights and prosecuting this action.

8   WHEREFORE, SWA prays for judgment against Rural/Metro as follows:

9   (a)   For temporary and permanent injunctive relief prohibiting Rural/Metro from

10      terminating the License Agreement;

11   (b)   For a declaration of non-infringement and non-dilution of trademark;

12   (c)   For a declaration that SWA has not engaged in unfair competition under the *Lanham*

13      *Act*, 15 U.S.C. § 1125(a);

14   (d)   For a declaration that SWA has not breached the License Agreement;

15   (e)   For an award of SWA's attorneys' fees, costs and expenses incurred in bringing this

16      action;

17   (f)   For an award of prejudgment and post-judgment interest on any amounts awarded

18      herein; and

19   (g)   For such other relief as the Court deems just and proper.

20   DATED this 20th day of December, 2002.

22   Patrick J. Reilly, Esq.
Hale Lane Peek Dennison and Howard
23   2300 West Sahara Avenue
Suite 800, Box 8
24   Las Vegas, Nevada 89102

25   Robert J. Itri, Esq. (010938)
Brian W. LaCorte, Esq. (012237)
26   Gallagher & Kennedy, P.A.
2575 East Camelback Road
27   Phoenix, Arizona 85016-9225

28   *Attorneys for Plaintiff SWA, L.L.C.*

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

**DEMAND FOR JURY TRIAL**

Plaintiff SWA, L.L.C. hereby demands a jury trial on all issues so triable.

DATED this ____ day of December, 2002.

Patrick J. Reilly, Esq.
Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue
Suite 800, Box 8
Las Vegas, Nevada 89102
Telephone (702) 222-2500
Facsimile (702) 365-6940

Robert J. Itri, Esq. (010938)
Brian W. LaCorte, Esq. (012237)
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone (602) 530-8000
Facsimile (602) 530-8500

*Attorneys for Plaintiff SWA, L.L.C.*

# V E R I F I C A T I O N

STATE OF ARIZONA     )
                     ) ss.
COUNTY OF MARICPOA   )

         PATRICK CANTELME       , being first duly sworn upon his/her oath, deposes and declares as follows:

    1.    I am an adult, over twenty-one (21) years old.

    2.    I am the _____MANAGER_____ for SWA, L.L.C., a Nevada limited liability company, and I am authorized to make this Verification on SWA's behalf.

    3.    I have read the Complaint, and the contents thereof and exhibits thereto are true, correct, and accurate to the best of my knowledge, except for those matters stated therein based upon information and belief, and as to those matters, I believe them to be true.

    4.    Each of the foregoing statements is based on my personal knowledge, including my knowledge derived from the business records maintained by SWA. If called to testify, I will testify as stated in this Verification.

    DATED this 20t day of December, 2002.

I do hereby swear under penalty of perjury that the foregoing assertions contained in this Affidavit are true and correct.

*[Notary seal: OFFICIAL SEAL / JACQUE HOLLADAY / Notary Public - State of Arizona / MARICOPA COUNTY / My Comm. Expires Sept. 30, 2003]*

*[Signature: Patrick Cantelme]*

SIGNED and SWORN to before me on this 20th day of December, 2002..

*[Signature: Holladay]*
NOTARY PUBLIC
My Commission Expires: Sept. 30, 2003

Las Vegas, Nevada 89102

Ex. 1

**STOCK PURCHASE AGREEMENT**

by and between

**SWA, LLC,**
**a Nevada limited liability company**
("Purchaser")

and

**RURAL/METRO CORPORATION,**
**a Delaware corporation**
("Seller")

with respect to the stock of

**RURAL/METRO OF NEVADA, INC.,**
**a Delaware corporation**
("Company")

Dated as of August 31, 2000

865530/13101.0001

# TABLE OF CONTENTS

Page

ARTICLE I       SALE OF THE SHARES ................................................................ 1
  1.1     Sale of the Shares.................................................................................. 1
ARTICLE II      PURCHASE PRICE AND MANNER OF PAYMENT................................. 1
  2.1     Purchase Price....................................................................................... 1
  2.2     Escrow.................................................................................................. 2
ARTICLE III     REPRESENTATIONS AND WARRANTIES........................................... 2
  3.1     Representations and Warranties of Purchaser............................................. 2
      (a)     Organization................................................................................. 2
      (b)     Power and Authority...................................................................... 2
      (c)     Enforceability............................................................................... 2
      (d)     Absence of Conflicting Agreements; Requirements of Law. .................... 2
      (e)     Purchase of the Shares. ................................................................. 2
  3.2     Representations and Warranties of Cantelme ............................................. 4
      (a)     Power and Authority...................................................................... 4
      (b)     Enforceability............................................................................... 4
  3.3     Representations and Warranties of Seller. ................................................. 4
      (a)     Organization................................................................................. 4
      (b)     Power and Authority...................................................................... 4
      (c)     Enforceability............................................................................... 4
      (d)     Absence of Conflicting Agreements; Requirements of Law ..................... 4
      (e)     Capital Stock of the Company/SALV................................................. 5
      (f)     Subsidiaries ................................................................................. 5
      (g)     Limitations of Representations and Warranties.................................... 5
ARTICLE IV      CONDUCT PRIOR TO THE CLOSING............................................... 5
  4.1     General.................................................................................................. 5
  4.2     Conduct by Purchaser and Cantelme. ...................................................... 5
      (a)     Nondisclosure/Confidentiality ......................................................... 5
      (b)     Equitable Relief ............................................................................ 6
  4.3     Conduct by Seller................................................................................... 6
      (a)     Nondisclosure/Confidentiality ......................................................... 6

## TABLE OF CONTENTS
### (continued)

Page

(b)     Equitable Relief. ................................................................ 7

4.4     Joint Obligations of Purchaser, Cantelme and Seller........................................... 7

(a)     Notice. ................................................................................ 7

(b)     Performance. ...................................................................... 7

ARTICLE V     CONDITIONS PRECEDENT TO CLOSING ........................... 7

5.1     Conditions Precedent to Purchaser's Obligations. ................................................. 7

(a)     Representations and Warranties. ................................................ 7

(b)     Seller's Obligations Performed. ................................................ 7

(c)     Approvals from the City of Las Vegas and Clark County, Nevada........... 8

(d)     Termination of Certain Agreements ........................................ 8

(e)     Capital Equipment and Vehicle Lease Agreement ..................................... 8

(f)     Licensing Agreement ................................................................ 8

(g)     Closing Certificate of Seller. ................................................ 8

(h)     Payments of Accounts Payable Arising Prior to May 31, 2000 ................ 8

(i)     Escrow Agreement ................................................................ 8

(j)     Documents to be Delivered by Seller. ........................................ 9

5.2     Conditions Precedent to Seller's Obligations. ........................................................ 9

(a)     Representations and Warranties. ................................................ 9

(b)     Purchaser's Obligations Performed. ........................................ 9

(c)     Capital Equipment and Vehicle Lease Agreement ..................................... 9

(d)     Licensing Agreement ................................................................ 9

(e)     Closing Certificate of Purchaser. ................................................ 9

(f)     Consents. ............................................................................... 9

(g)     No Suit, Proceeding or Investigation. ........................................ 9

(h)     Escrow Agreement ................................................................ 9

(i)     Payments of Accounts Payable Arising After May 31, 2000 .................. 10

(j)     Non-Competition Letter Agreement ........................................ 10

(k)     Documents to be Delivered by Purchaser and Cantelme. ......................... 10

ARTICLE VI     CLOSING ................................................................ 10

6.1     Time and Place of Closing. ................................................................ 10

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| 6.2 | | Form of Documents. | 10 |
| 6.3 | | Seller's Deliveries. | 10 |
| | (a) | The Shares. | 10 |
| | (b) | The Termination and Assumption Agreement | 10 |
| | (c) | The Capital Equipment and Vehicle Lease Agreement | 10 |
| | (d) | The Licensing Agreement | 10 |
| | (e) | The Non-Competition Letter Agreement | 10 |
| | (f) | The Closing Certificate of Seller. | 10 |
| | (g) | Corporate Resolutions. | 11 |
| | (h) | Delivery of Stock Books and Resignations. | 11 |
| | (i) | Other Documents. | 11 |
| 6.4 | | Purchaser's Deliveries. | 11 |
| | (a) | The Purchase Price. | 11 |
| | (b) | The Termination and Assumption Agreement. | 11 |
| | (c) | The Capital Vehicle and Equipment Lease Agreement | 11 |
| | (d) | The Licensing Agreement. | 11 |
| | (e) | The Non-Competition Letter Agreement | 11 |
| | (f) | The Closing Certificate of Purchaser | 11 |
| | (g) | Corporate Resolutions. | 11 |
| | (h) | Consents and Estoppel Letters. | 11 |
| | (i) | Other Documents. | 11 |
| 7.1 | | Non-Competition by Purchaser and Cantelme | 12 |
| | (a) | Non-Competition | 12 |
| | (b) | Non-Solicitation by Purchaser and Cantelme | 12 |
| | (c) | Equitable Relief | 13 |
| | (d) | Restrictions Separable. | 13 |
| 7.2 | | Non-competition by Seller | 13 |
| | (a) | Non-competition | 13 |
| | (b) | Non-Solicitation | 13 |
| | (c) | Equitable Relief | 14 |

# TABLE OF CONTENTS
## (continued)

Page

(d)  Restrictions Separable..................................................................................... 14

7.3  Change of Name ................................................................................................ 14

7.4  Right of First Refusal........................................................................................ 14

7.5  Purchase Option ................................................................................................ 15

7.6  No Assignment................................................................................................... 15

7.7  Assumption of Accounts Payable arising after May 31, 2000............................. 15

ARTICLE VIII   TERMINATION............................................................................... 15

8.1  Right to Terminate. ........................................................................................... 15

8.2  Remedies............................................................................................................. 15

(a)  Proceed to Close. ................................................................................. 16

(b)  Decline to Close................................................................................... 16

8.3  Right to Damages............................................................................................... 16

INDEMNIFICATION............................................................................................... 16

9.1  Indemnification by Seller.................................................................................. 16

9.2  Indemnification by Purchaser ........................................................................... 16

9.3  Notice of Claims ................................................................................................ 16

9.4  Deductible .......................................................................................................... 17

ARTICLE X   MISCELLANEOUS ............................................................................. 17

10.1  Fees. ................................................................................................................. 17

10.2  Notices. ............................................................................................................ 17

10.3  Entire Agreement. ........................................................................................... 18

10.4  Waivers. ........................................................................................................... 18

10.5  Facsimile; Counterparts. ................................................................................. 19

10.6  Due Diligence Investigation ........................................................................... 19

10.7  Severability. ..................................................................................................... 19

10.8  Applicable Law................................................................................................. 19

10.9  Construction..................................................................................................... 19

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 31st day of August, 2000, by and between **SWA, LLC**, a Nevada limited liability company ("Purchaser"), and **RURAL/METRO CORPORATION**, a Delaware corporation ("Seller").

### RECITALS

A.      Seller owns all of the issued and outstanding shares (the "Shares") of Rural/Metro of Nevada, Inc., a Delaware corporation (the "Company").

B.      The Company owns a minority interest in Southwest Ambulance – Las Vegas, Inc., a Nevada corporation ("SALV"), and has an option to purchase 30,251 shares of the common stock of SALV, pursuant to that certain Shareholders' Agreement, dated March 19, 1999, by and among SALV, the Company, Sharon Henry and John Wilson (the "Shareholders' Agreement").

C.      SALV intends to operate an ambulance, paramedic, emergency response, and medical and wheelchair transport service business in Clark County, Nevada (the "Business").

D.      Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, all of Seller's right, title and interest in and to the Shares upon the terms and conditions contained herein.

E.      As a member of Purchaser and in consideration of the direct and indirect benefits received from the transactions contemplated in this Agreement, Patrick Cantelme ("Cantelme") has agreed to be bound by Sections 3.2, 4.2, 4.4, 5.1(d), 7.1, 10.1 and 10.6 of this Agreement.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants contained herein, the parties hereto hereby agree as follows:

### ARTICLE I

#### Sale of the Shares

1.1      **Sale of the Shares.** At the closing of the transactions contemplated by this Agreement in accordance with Section 6.1 hereof (the "Closing"), Seller shall sell, transfer, convey, assign and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to the Shares.

### ARTICLE II

#### Purchase Price and Manner of Payment

2.1      **Purchase Price.** The total purchase price shall be $1,000,000 in cash payable on the Closing Date by wire transfer to an account designated by Seller (the "Purchase Price").

2.2    **Escrow.**    Concurrent with the execution of this Agreement, Purchaser shall deposit into escrow the Purchase Price and Seller shall deposit into escrow a stock certificate representing the Shares, together with a stock power duly endorsed to transfer the Shares to Purchaser, pursuant to an escrow agreement in the form attached hereto as Exhibit A (the "Escrow Agreement").

### ARTICLE III

### Representations and Warranties

3.1    **Representations and Warranties of Purchaser.**    To induce Seller to enter into this Agreement and to perform Seller's obligations hereunder, and with full knowledge that Seller will rely thereon, Purchaser represents and warrants, as of the date hereof, the truth, accuracy and completeness of the following:

(a)    **Organization.**    Purchaser is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Nevada, with all requisite power and authority to enter into and perform this Agreement and the Other Purchaser Agreements (as defined below).

(b)    **Power and Authority.**    The signing, delivery, and consummation of the transactions contemplated by this Agreement and the other agreements and documents referenced herein to which Purchaser is a party (the "Other Purchaser Agreements") by Purchaser have been duly authorized by all necessary action.

(c)    **Enforceability.**    This Agreement and the Other Purchaser Agreements constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally.

(d)    **Absence of Conflicting Agreements; Requirements of Law.**    The execution, delivery and performance of this Agreement by Purchaser does not require the consent of any third party and neither conflicts with, results in a breach of, or constitutes a default under any applicable law, judgment, order, injunction, decree, rule, regulation, or ruling of any court or governmental instrumentality, or the Articles of Organization or the Operating Agreement of Purchaser, nor does it conflict with, constitute grounds for termination of, result in a breach of, or constitute a default under any agreement, instrument, license or permit to which Purchaser is now subject.

(e)    **Purchase of the Shares.**    Purchaser:

(i)    is an "Accredited Investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (the "Act");

(ii)    understands that the purchase of the Shares involves a high degree of risk;

(iii)    has the ability to bear the economic risk of the purchase of the Shares;

(iv)    has sufficient knowledge and experience in business and financial matters to be capable of evaluating the merits and risks of the purchase of the Shares;

(v)    has been encouraged and has had the opportunity to rely upon the advice of its legal counsel and accountants and other financial advisors with respect to the financial, tax and other considerations relating to the purchase of the Shares;

(vi)    acknowledges that it is fully familiar with all aspects of the Company, SALV and the Business and has had the opportunity to ask questions and receive information with respect to, among other things, the proposed business affairs, financial condition, plans and prospects of the Company and the terms and conditions of the purchase of the Shares, as Purchaser has requested so as to more fully understand its investment;

(vii)    acknowledges that the Shares are being acquired for Purchaser's own account without any view to the transfer, sale, assignment or other distribution thereof and the Purchaser has no contract, undertaking, agreement or arrangement to sell or otherwise transfer of dispose of any of the Shares;

(viii)    acknowledges that there is not now, and that there is not likely to be in the future, any market for the Shares and that the Shares must be held by Purchaser for an indefinite period of time, absent registration or qualification of the Shares under applicable laws;

(ix)    acknowledges that the Shares have not been and will not be registered under any federal or state, and that no federal or state, governmental agency or authority has approved or passed upon the issuance of the Shares, and that the Shares will bear the following legend:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY STATE SECURITIES ACT, AND ARE "RESTRICTED SECURITIES" WITHIN THE MEANING OF SUCH ACTS. FURTHER, THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO TRANSFER RESTRICTIONS UNDER APPLICABLE SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE DISTRIBUTED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER SUCH ACTS OR EXEMPTION FROM REGISTRATION UNDER SUCH ACTS.

3.2    **Representations and Warranties of Cantelme.**  To induce Seller to enter into this Agreement and to perform Seller's obligations hereunder, and with full knowledge that Seller will rely thereon, Cantelme represents and warrants, as of the date hereof, the truth, accuracy and completeness of the following:

(a)    **Power and Authority.**  Cantelme has the full power and authority to execute and deliver this Agreement and the other agreements referenced herein to which Cantelme is or will be a party (the "Other Cantelme Agreements") and to consummate the transactions contemplated hereby and thereby.

(b)    **Enforceability.**  This Agreement and the Other Cantelme Agreements have been or at the Closing will have been, duly executed and delivered by Cantelme and constitute or at Closing will constitute, legal, valid and binding obligations of Cantelme, enforceable against Cantelme in accordance with their respective terms, except to the extent that enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting the enforcement of creditors' right generally.

3.3    **Representations and Warranties of Seller.**  To induce Purchaser to enter into this Agreement and to perform Purchaser's obligations hereunder, and with full knowledge that Purchaser will rely thereon, Seller represents and warrants, as of the date hereof, the truth, accuracy and completeness of the following:

(a)    **Organization.**  Each of Seller and the Company is a corporation duly formed and validly existing under the laws of the State of Delaware.

(b)    **Power and Authority.**  Seller has the corporate power and authority to execute and deliver this Agreement and the other agreements referenced herein to which Seller is or will be a party (the "Other Seller Agreements"), and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and the Other Seller Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by Seller's board of directors, and no other corporate proceedings on the part of Seller are required to authorize the execution and delivery of this Agreement, the Other Seller Agreements, or the consummation of the transactions contemplated hereby or thereby.

(c)    **Enforceability.**  This Agreement and the Other Seller Agreements have been, or at the Closing will have been, duly executed and delivered by Seller and constitute, or at the Closing will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally and general principles of equity.

(d)    **Absence of Conflicting Agreements; Requirements of Law.**  Neither the execution and delivery by Seller of this Agreement and the Other Seller Agreements, nor the consummation of the transactions contemplated hereby or thereby, will conflict with, or result in a breach of, or default under any organizational documents or contractual obligations to which Seller is a party, or by which Seller or any of its properties or assets is otherwise bound or violate

any requirement of law applicable to Purchaser or any of its properties or assets. No governmental filing, consent, license, approval, permit, authorization or other action is required of Seller in connection with the execution and delivery of this Agreement and the Other Seller Agreements, nor the consummation by Seller of the transactions contemplated hereby and thereby.

(e)    **Capital Stock of the Company/SALV.** The Company has authorized capital stock consisting of 1,000 shares of common stock, par value $.01 per share, of which 100 shares are outstanding and are held of record by Seller. Each and all of the Shares have been validly authorized and issued, fully paid and nonassessable and constitute all of the issued and outstanding shares of capital stock of the Company. Seller has good and marketable title to the Shares, and each and all of the Shares are free and clear of all liens, claims, rights, charges, encumbrances and security interests of whatsoever nature or type. The Company has not granted any option, warrant, subscription or similar right to any person or party to purchase or acquire any rights with respect to any Shares of capital stock of the Company, and there exist no securities convertible or exchangeable into shares of capital stock.

The Company owns 1,990 shares of the common stock of SALV. The Company has an option to purchase 30,251 shares of the common stock of SALV, pursuant to the Shareholders' Agreement, which option is in full force and effect.

(f)    **Subsidiaries.** Except for the Company's minority equity interest in SALV, the Company has no subsidiaries or any other equity investment in any entity.

(g)    **Limitations of Representations and Warranties.** Seller shall not be deemed to have made any representations or warranties other than expressly made by Seller in this Agreement or the Other Seller Agreements. Except as expressly set forth herein, Seller makes no representations or warranties, express or implied, with respect to the Shares, the Company, the Business or SALV, and any projections, estimates or budgets delivered or made available to Purchaser and Cantelme. The representations and warranties set forth in this Article III shall survive the Closing for a period of one year.

## ARTICLE IV

### Conduct Prior to the Closing

4.1    **General.** Between the date hereof and the Closing Date (as defined in <u>Section 6.1</u> hereof), Purchaser, Cantelme and Seller shall have the rights and obligations that are set forth in this Article IV.

4.2    **Conduct by Purchaser and Cantelme.** The following are the obligations of Purchaser and Cantelme:

(a)    **Nondisclosure/Confidentiality.** From and after the date of this Agreement, Purchaser and Cantelme shall not disclose to any third party (other than to Purchaser's members, managers, officers and employees having a need to know such information in connection with the transactions contemplated hereby, or to Purchaser's attorneys, accountants, consultants, investors and lenders), or use for any purpose other than as

865530/13101.0001                    5

contemplated by this Agreement, any proprietary or confidential information regarding Seller, the Company or SALV ("Seller Confidential Information"). Purchaser and Cantelme agree not to disseminate or disclose any Seller Confidential Information to others except as hereinabove described, nor to use any Seller Confidential Information or permit to be used any Seller Confidential Information through Purchaser's agents, employees or others on behalf of Purchaser and Cantelme to damage Seller, the Company or SALV. The preceding two (2) sentences shall not apply to information that (i) is, was, or becomes generally known or available to the public or the industry other than as a result of a disclosure by Purchaser or Cantelme in violation of this Agreement; (ii) was previously known by Purchaser or Cantelme; (iii) is subsequently obtained by Purchaser or Cantelme from an independent third-party source having no obligation of confidentiality to Seller, the Company or SALV; or (iv) is required to be disclosed by law. Purchaser and Cantelme shall advise Seller, in writing, of any request, including a subpoena or similar legal inquiry, to disclose any such Seller Confidential Information, such that Seller can seek appropriate legal relief.

(b)     **Equitable Relief.**  Purchaser and Cantelme acknowledge and agree that the covenants contained in this Section 4.2, are a material inducement for Seller to execute and deliver this Agreement and to consummate the transactions contemplated hereby. Purchaser and Cantelme acknowledge and agree that the restrictions contained in this Section 4.2 are reasonable and necessary for the protection of the business of Seller, the Company and SALV, and that a breach of any such restriction could not be adequately compensated by damages in an action at law. In the event of a breach or threatened breach by Purchaser, Cantelme or any of their respective affiliates of any of the provisions of this Section 4.2, Seller shall be entitled to obtain without the necessity of posting bond therefor, an injunction (preliminary or permanent, or a temporary restraining order) restraining Purchaser and/or Cantelme from the activity or threatened activity constituting, or which would constitute, a breach, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such a violation, which right shall be cumulative and in addition to any other rights or remedies to which Seller may be entitled.

4.3     **Conduct by Seller.**  The following are the obligations of Seller:

(a)     **Nondisclosure/Confidentiality.**  From and after the date of this Agreement, Seller shall not disclose to any third party (other than to its directors, officers, and employees having a need to know such information in connection with the transaction contemplated hereby, or to its attorneys, accountants, consultants, investors and lenders), or use for any purpose other than as contemplated by this Agreement, any proprietary or confidential information regarding Purchaser or Cantelme ("Purchaser Confidential Information"). Seller agrees not to disseminate or disclose any Purchaser Confidential Information to others except as hereinabove described, nor to use any Purchaser Confidential Information or permit to be used any Purchaser Confidential Information through its agents, employees or others. The preceding two (2) sentences shall not apply to information that (i) is, was, or becomes generally known or available to the public or the industry other than as a result of a disclosure by Seller in violation of this Agreement; (ii) was previously known by Seller; (iii) is subsequently obtained by Seller from an independent third-party source having no obligation of confidentiality to Purchaser or Cantelme; or (iv) is required to be disclosed by law.  Seller shall advise Purchaser and Cantelme, in writing, of any request, including a

subpoena or similar legal inquiry, to disclose any such Purchaser Confidential Information, such that Purchaser or Cantelme can seek appropriate legal relief.

(b)     **Equitable Relief.**  Seller acknowledges and agrees that the covenants contained in Section 4.3 are a material inducement for Purchaser and Cantelme to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  Accordingly, Seller acknowledges and agrees that the restrictions contained in Section 4.3 are reasonable and necessary for the protection of the business of Purchaser and Cantelme and that a breach of any such restriction could not adequately be compensated by damages in an action at law.  In the event of a breach or threatened breach by Seller of any of the provisions of Section 4.3, Purchaser and Cantelme shall be entitled to obtain, without the necessity of posting bond therefor, an injunction (preliminary or permanent, or a temporary restraining order) restraining Seller from the activity or threatened activity constituting, or which would constitute, a breach, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from a violation, which right shall be cumulative and in addition to any other rights or remedies to which Purchaser and Cantelme may be entitled.

4.4     **Joint Obligations of Purchaser, Cantelme and Seller.**  The following shall apply with equal force to Purchaser, Cantelme and Seller:

(a)     **Notice.**  Each party shall promptly give the other party written notice of the existence or occurrence of any condition that would make any representation or warranty of the notifying party untrue or that might reasonably be expected to prevent the consummation of the transactions herein contemplated.

(b)     **Performance.**  No party shall intentionally perform or omit to perform any act which, if performed or omitted, would prevent or excuse the performance of this Agreement by any party hereto or that would result in any representation or warranty contained herein of that party being untrue in any material respect as of the date hereof and as of the Closing Date.

## ARTICLE V

### Conditions Precedent to Closing

5.1     **Conditions Precedent to Purchaser's Obligations.**  The obligation of Purchaser to consummate the transactions contemplated hereby is subject to fulfillment by Seller, or written waiver by Purchaser, of each of the following conditions precedent on or prior to the Closing Date:

(a)     **Representations and Warranties.**  Each and every representation and warranty made by Seller shall have been true and correct in all material respects when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b)     **Seller's Obligations Performed.**  All obligations of Seller to be performed hereunder through and including the Closing Date (including, without limitation, all obligations which Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed.

(c)    **Approvals from the City of Las Vegas and Clark County, Nevada.** Purchaser or SALV shall have obtained approval from the City of Las Vegas and Clark County, Nevada with respect to a license to operate an ambulance service business in the foregoing jurisdictions.

(d)    **Termination of Certain Agreements.** All intercompany agreements entered into by the Company and SALV, on the one hand, and Seller and any of its other subsidiaries and affiliates shall have been terminated on or before the Closing Date. In addition, the following agreements shall also have been terminated on or before the Closing Date: (i) Administrative Services and Management Agreement, dated March 23, 1999, by and between the Company and SALV, (ii) Consulting Agreement, dated as of March 23, 1999, by and between SALV and Cantelme (the "Consulting Agreement"), and Seller's guaranty of the Consulting Agreement, and (iii) Agreement between Shareholders, dated March 23, 1999, by and between the Company and Cantelme, and Seller's guaranty of such agreement. Purchaser shall also have assumed all of Seller's obligations and indemnify Seller for, from and against the following liabilities and obligations: (1) the payment obligations of Seller arising under that certain Consulting Agreement, dated March 19, 1999, by and between Seller and J & B Consulting, Inc., specifically excluding, without limitation, any obligations with respect to options to purchase shares of Seller's common stock, and (ii) all liabilities and obligations of Seller arising under that certain Guaranty of Lease with respect to the premises located at 4640 South Arville, Suite G and H, Las Vegas, Nevada 89103 (the "Premises"), which guaranty is dated May 1, 2000 and made by Seller in favor of Biotronics Ltd., the landlord under the lease for the Premises.

Seller and Purchaser shall have entered into enter into a Termination and Assumption Agreement in the form attached hereto as Exhibit B, providing for the termination and assumption of the agreements and obligations as described above (the "Termination and Assumption Agreement").

(e)    **Capital Equipment and Vehicle Lease Agreement.** Seller and Purchaser or their respective designees shall have entered into the Capital Equipment and Vehicle Lease Agreement as defined in Section 5.2(c).

(f)    **Licensing Agreement.** Seller and Purchaser or their respective designees shall have entered into the Licensing Agreement as defined in Section 5.2(d).

(g)    **Closing Certificate of Seller.** Seller shall have executed a closing certificate, dated as of the Closing Date, in form attached hereto as Exhibit C ("Closing Certificate of Seller").

(h)    **Payments of Accounts Payable Arising Prior to May 31, 2000.** Seller shall have paid all accounts payables, debts and obligations of SALV owing to all third parties, including employees, incurred on or before May 31, 2000.

(i)    **Escrow Agreement.** All of the conditions in the Escrow Agreement shall have been satisfied.

(j)      **Documents to be Delivered by Seller.**  Seller shall have executed and delivered the documents required by <u>Section 6.3</u> below.

5.2      **Conditions Precedent to Seller's Obligations.**  The obligation of Seller to consummate the transactions contemplated hereby is subject to the fulfillment by Purchaser and Cantelme, or written waiver by Seller, of each of the following conditions precedent on or prior to the Closing Date:

(a)      **Representations and Warranties.**  Each and every representation and warranty made by Purchaser and Cantelme shall be true and correct in all material respects when made and shall be true and correct as if originally made on and as of the Closing Date.

(b)      **Purchaser's Obligations Performed.**  All obligations of Purchaser and Cantelme to be performed hereunder through and including the Closing Date (including, without limitation, all obligations which Purchaser and Cantelme would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been performed.

(c)      **Capital Equipment and Vehicle Lease Agreement.**  Seller and Purchaser shall have entered into a Capital Equipment and Vehicle Lease in the form attached hereto as <u>Exhibit D</u> (the "Capital Equipment and Vehicle Lease Agreement"), pursuant to which Seller or its designee shall lease to Purchaser or its designee a "Tri-Tech CAD" dispatching system and certain ambulances and other vehicles and equipment.  Purchaser shall also purchase certain ambulances from Seller or its designee with payment to be made on or prior to the Closing Date.  Any ambulances owned by the Company shall have been transferred to Seller or its designee prior to or concurrent with the execution of the Capital Equipment and Vehicle Lease Agreement.

(d)      **Licensing Agreement.**  Seller and Purchaser shall have entered into a licensing agreement in the form attached hereto as <u>Exhibit E</u> (the "Licensing Agreement"), pursuant to which Seller shall license to Purchaser or its designee a royalty-free, exclusive and irrevocable license to use the "Rural/Metro of Nevada" name in Clark, County, Nevada and "Southwest Ambulance" name in connection with Purchaser's and SALV's ambulance service business in the entire State of Nevada, including Clark County, Nevada.

(e)      **Closing Certificate of Purchaser.**  Purchaser shall have executed a closing certificate, dated the Closing Date, in the form attached hereto as <u>Exhibit F</u> ("Closing Certificate of Purchaser").

(f)      **Consents.**  All of the consents, licenses, approvals and estoppel letters necessary to consummate the transactions contemplated herein.

(g)      **No Suit, Proceeding or Investigation.**  No suit, proceeding, inquiry or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek damages on account of the execution and delivery of this Agreement, the consummation of the transactions herein contemplated.

(h)      **Escrow Agreement.**  All of the conditions in the Escrow Agreement shall have been satisfied.

(i)   **Payments of Accounts Payable Arising After May 31, 2000.**  Purchaser shall have paid or reimbursed Seller for all accounts payable, debts and obligations of SALV owing to third parties, including, without limitation, employees, incurred on or after June 1, 2000 (the "Assumed Liabilities").

(j)   **Non-Competition Letter Agreement.**  Seller shall have delivered to Robert E. Ramsey, Jr. a non-competition letter agreement in the form attached hereto as Exhibit G (the "Non-Competition Letter Agreement").

(k)   **Documents to be Delivered by Purchaser and Cantelme.**  Purchaser and Cantelme shall have executed and delivered the documents required by Section 6.4 below.

## ARTICLE VI

### Closing

6.1   **Time and Place of Closing.**  The Closing shall take place as soon as reasonably practicable following the satisfaction of the conditions precedent set forth in Article V hereof, or on such later date as the parties hereto may agree (the "Closing Date"), but not later than October 30, 2000.  The Closing shall be held at the Phoenix, Arizona offices of Gallagher & Kennedy, P.A. or at such other place as the parties may agree.

6.2   **Form of Documents.**  At the Closing, each party shall deliver the documents, and shall perform the other acts, which are set forth in this Article VI.  All documents which Seller shall deliver shall be in form and content reasonably satisfactory to Purchaser and Cantelme.  All documents which Purchaser and Cantelme shall deliver shall be in form and content reasonably satisfactory to Seller.

6.3   **Seller's Deliveries.**  Subject to the fulfillment or written waiver of the conditions precedent set forth in Section 5.2 hereof, Seller shall execute and/or deliver, or cause to be executed and delivered, to Purchaser at the Closing, all of the following:

(a)   **The Shares.**  The Shares, together with all necessary stock powers to transfer the Shares from Seller to Purchaser.

(b)   **The Termination and Assumption Agreement.**  The Termination and Assumption Agreement.

(c)   **The Capital Equipment and Vehicle Lease Agreement.**  The Capital Equipment and Vehicle Lease Agreement.

(d)   **The Licensing Agreement.**  The Licensing Agreement.

(e)   **The Non-Competition Letter Agreement.**  The Non-Competition Letter Agreement.

(f)   **The Closing Certificate of Seller.**  The Closing Certificate of Seller.

(g)    **Corporate Resolutions.**  A certified copy of resolutions of Seller's board of directors and shareholders, if necessary, authorizing the execution, delivery and performance of this Agreement, the other agreements referenced herein to be executed by Seller, and the transactions contemplated hereby and thereby.

(h)    **Delivery of Stock Books and Resignations.**  All of the following items shall be delivered to Purchaser and Cantelme:

(i)    The stock books, stock ledgers, minute books and corporate seals for the Company; and

(ii)    Resignations of all directors and officers of the Company, dated effective as of the Closing Date.

(i)    **Other Documents.**  Without limitation by specific enumeration of the foregoing, all other documents reasonably required to consummate the transactions contemplated herein.

6.4    **Purchaser's Deliveries.**  Subject to the fulfillment or waiver of the conditions set forth in <u>Section 5.1</u> hereof, Purchaser shall deliver to Seller at the Closing, and shall execute and/or deliver to Seller, all of the following:

(a)    **The Purchase Price.**  The Purchase Price.

(b)    **The Termination and Assumption Agreement.**  The Termination and Assumption Agreement.

(c)    **The Capital Vehicle and Equipment Lease Agreement.**  The Capital Vehicle and Equipment Lease Agreement.

(d)    **The Licensing Agreement.**  The Licensing Agreement.

(e)    **The Non-Competition Letter Agreement.**  The Non-Competition Letter Agreement.

(f)    **The Closing Certificate of Purchaser.**  The Closing Certificate of Purchaser.

(g)    **Corporate Resolutions.**  A certified copy of resolutions of Purchaser's members authorizing and approving the execution, delivery and performance of this Agreement, the other agreements referenced herein, and the transactions contemplated herein and therein.

(h)    **Consents and Estoppel Letters.**  All consents, approvals and estoppel letters referred to in <u>Section 5.2(f)</u> hereof (other than from Seller's lenders and bondholders), or acceptable alternate arrangements with respect thereto.

(i)    **Other Documents.**  Without limitation by specific enumeration of the foregoing, all other documents reasonably required to consummate the transactions contemplated

herein, including, without limitation, all documents and instruments reasonably requested by Seller.

## ARTICLE VII

### Post Closing Obligations

7.1    Non-Competition by Purchaser and Cantelme.

(a)    **Non-Competition.**  For a period commencing on the Closing Date and ending on June 1, 2004 (the "Restricted Period"), Purchaser and Cantelme, jointly and severally covenant and agree that they, individually and collectively, shall not, unless otherwise expressly agreed to in writing by Seller (whether directly or indirectly, as owner, principal, agent, stockholder, director, officer, manager, employee, partner, participant, or in any other capacity) perform any duties for or engage or become financially interested in any Competitive Business conducted within the Restricted Territory, including, without limitation, making or obtaining any application for a certificate of necessity, certificate of public convenience, governmental or private license or permit, or any other authorization with respect to any Competitive Business conducted by Seller or any of its direct or indirect subsidiaries or affiliates.  For purposes of this Section 7.1, "Competitive Business" shall mean the delivery of emergency or general transport ambulance business (whether ALS, BLS, or other level of service), the medical and non-medical (wheelchair and livery) transport service business, or any other business in competition with Seller or any of its direct or indirect subsidiaries or affiliates, or any aspect of any of the foregoing, in each case other than Permitted Activities.  As used herein, "Permitted Activities" means only (a) consulting and advisory services provided by Cantelme only to the City of Phoenix Fire Department with respect to such department's operations solely within the City of Phoenix, (b) medical personnel training and education and equipment training and education, (c) contract labor services, (d) activities conducted by Southwest General Services of Dallas, L.L.C., a Delaware limited liability company owned jointly by Cantelme and a subsidiary of Seller ("Southwest-Dallas") in accordance with the Operating Agreement of Southwest-Dallas, and (e) consulting services provided to governmental, labor and private organizations in connection with fire protection, emergency response and related businesses, provided that (i) such Permitted Activities are not conducted, directly or indirectly, in competition with Seller or any direct or indirect subsidiary or affiliate of Seller within the same geographic area (e.g., county, greater metropolitan area or service cachement area), and (ii) Seller is given prior notice thereof.  As used herein, the "Restricted Territory" shall mean geographic areas (e.g., counties, greater metropolitan areas and service cachement areas) within which Seller or any direct or indirect subsidiaries or affiliates of Seller render services or otherwise conduct business at any time during the Restricted Period.  Excluded from the definition of Restricted Territory shall be any area completely abandoned by Seller or an affiliate after the date of this Agreement, including, but not limited to, the State of Nevada.

(b)    **Non-Solicitation by Purchaser and Cantelme.**  During the Restricted Period, Purchaser and Cantelme, jointly and severally covenant and agree that, individually and collectively, they shall not, directly or indirectly, or on behalf of, or in connection with any person, firm, or other entity, request any past, present, or future customers of Seller or any of its direct or indirect subsidiaries and affiliates (the "Seller Group") to curtail or cancel their business

with the Seller Group; solicit, canvas, accept, encourage, or authorize any other person to solicit, canvas, accept, authorize, from any past or present customer of the Seller Group, any business for any other person, firm, or corporation engaged in a business the same as, similar to, or in general competition with the business of the Seller Group; or induce or attempt to influence any employee, independent contractor, or agent of the Seller Group to terminate that person's employment with or engagement by the Seller Group.

(c)     **Equitable Relief.**  Purchaser and Cantleme acknowledge that a breach of any of the provisions of this Section 7.1 would cause irreparable injury for which monetary damages are insufficient and therefore, Seller will be entitled to preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits, and other benefits arising from such violation, which right shall be cumulative and in addition to any other rights or remedies to which Company may be entitled. In the event of a violation of any provision of subparagraph (a) or (b) of this Section 7.1, the period for which those provisions would remain in effect shall be extended for a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have been finally terminated in good faith.

(d)     **Restrictions Separable.**  Each and every restriction set forth in this Section 7.1 is independent and severable from the others, and no restriction shall be rendered unenforceable by virtue of the fact that, for any reason, any other or others of them may be unenforceable in whole or in part.

7.2     **Non-competition by Seller.**

(a)     **Non-competition.**  Subject to the terms and conditions of that certain Letter Agreement between Purchaser and Seller, of even date herewith, during the Restricted Period, Seller (including its subsidiaries) agrees that it shall not, unless specifically agreed to in writing by Purchaser (whether directly or indirectly as owner, principal, agent, stockholder, director, officer, manager, employee, partner, participant or in any other capacity) perform any duties for or engage or become financially interested in any Competitive Business within the State of Nevada, including, without limitation, making or obtaining any application for a certificate of necessity, certificate of public convenience, governmental or private license or permit, or any authorization with respect to any Competitive Business conducted by Purchaser or Cantelme. For purposes of this Section 7.2, "Competitive Business" shall mean the delivery of emergency or general transport ambulance business (whether ALS, BLS, or other level of service), the medical and non-medical (wheelchair and livery) transport service business, or any other business in competition with Purchaser or Cantelme.

(b)     **Non-Solicitation.** During the Restricted Period, Seller (including its subsidiaries) shall not, directly or indirectly, or on behalf of, or in connection with any person, firm, or other entity, request any past, present or future customers of Purchaser to curtail or cancel their business with Purchaser; solicit, canvas, accept, encourage, or authorize any other person to solicit, canvas, accept, authorize or encourage, from any past or present customer of Purchaser, any business for any other person, firm, or corporation engaged in a business the same as, similar to, or in general competition with the business of Purchaser, or induce or attempt to

influence any employee, independent contractor, or agent of Purchaser to terminate that person's employment with or engagement by Purchaser.

(c)     **Equitable Relief.** Seller acknowledges that a breach of any of the provisions of this Section 7.2 would cause irreparable injury for which monetary damages are insufficient, and therefore, Purchaser and/or Cantelme will be entitled to preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits, and other benefits arising from such violation, which right shall be cumulative and in addition to any other rights or remedies to which Purchaser may be entitled. In the event of a violation of any provision of subparagraph (a) or (b) of this Section 7.2, the period for which these provisions would remain in effect shall be extended for a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have finally been determined in good faith.

(d)     **Restrictions Separable.** Each and every restriction set forth in this Section 7.2 is independent and severable from the others, and no restriction shall be rendered unenforceable by virtue of the fact that, for any reason, any other or others of them may be unenforceable in whole or in part.

7.3     **Change of Name.** Within the later of (i) ninety days after the Closing Date or (ii) thirty days after Purchaser or SALV has obtained the approvals set forth in Section 5.1(c) hereof, Purchaser shall cause the Company to change the Company's name to another name which is not deceptively similar to any name used by Seller prior to the Closing Date, and within ten business days thereafter, shall deliver a copy of the Amendment to the Company's Certificate of Incorporation reflecting such name change, certified by the Secretary of State for the state of Delaware. Purchaser shall deposit with the Escrow Agent an executed application, in form ready to be filed with the Secretary of State, to effect such name change.

7.4     **Right of First Refusal.** Commencing on the Closing Date and expiring on the seventh anniversary date of the Closing Date, if the Purchaser, the Company or SALV or their respective successors or assigns desires to merge with another entity, sell substantially all of the assets or stock of any of the foregoing parties, or effectuate any similar type of transaction (collectively, the "Transactions"), then Purchaser shall give written notice to Seller (the "Transaction Notice"), identifying the proposed parties to the Transactions, the purchase price for the Transactions (the "Offer Price") and the other terms and conditions of the Transactions. Such Transaction Notice shall constitute an irrevocable offer (the "Offer") by Purchaser or the applicable party to sell substantially all of the assets or stock upon the terms and conditions set forth in the Transaction Notice, including, without limitation, the Offer Price, to Seller. Seller shall have twenty days from receipt of the Transaction Notice to accept the Offer and shall provide written notice to Purchaser or the applicable party of its acceptance of the Offer (the "Acceptance Notice"). If Purchaser or the applicable party does not receive the Acceptance Notice within the foregoing twenty-day period then Purchaser or the applicable party may consummate the Transactions. If Seller accepts the Offer, Seller and Purchaser shall use their best efforts to consummate the Transactions within thirty days of Purchaser's receipt of the Acceptance Notice. Notwithstanding any other provision in this Section 7.3 to the contrary, a Transaction will not include encumbering the stock or assets of the Company or SALV or a transfer to any wholly-owned subsidiary of Purchaser.

865530/13101.0001                              14

7.5    **Purchase Option.** Commencing on the sixth anniversary date of the Closing Date, Seller shall have an option from Purchaser or the applicable entity, to purchase not less than all of the Shares or the shares of any successor entity (the "Purchase Option") at a purchase price equal to the Purchase Option Price. The Purchase Option Price shall equal the product of (a) the Company's then current ownership percentage in SALV, and (b) the greater of $12,000,000 or 6.9 times EBITDA; provided, however, if Purchaser increases its percentage stock ownership in SALV above 80.1%, then the Purchase Option Price will be increased according to the following formula:  $150,000 multiplied by each percentage point increase above 80.1%. For purposes of this Agreement, EBITDA shall means the earnings of SALV or the applicable entity before interest, depreciation, income taxes and amortization, as determined in accordance with generally accepted accounting principles and SALV's standard accounting practices, for the last consecutive twelve month period immediately preceding the repurchase year prior to the date Seller exercises the Purchase Option. Seller may exercise the Purchase Option at any time after the sixth anniversary date of the Closing Date, by delivering to Purchaser written notice of Seller's intent to exercise the Purchase Option (the "Purchase Option Notice"). The Purchase Option shall expire on the seventh anniversary of the Closing Date.  In the event that Seller exercises the Purchase Option, Seller and Purchaser shall use their best efforts to exchange the Purchase Option Price and the Shares within thirty days of Purchaser's receipt of the Purchase Option Notice (the "Purchase Option Closing"). Notwithstanding the foregoing, either Purchaser or Seller may delay the Purchase Option Closing until the thirtieth day following the seventh anniversary date of the Closing. Seller shall also have the option to require Purchaser to purchase the Purchase Option at any time between December 31, 2000 and December 31, 2002 for $500,000 (the "Put").

7.6    **No Assignment.** Seller shall not assign or transfer any of its rights arising under Section 7.3 or Section 7.4, except to a wholly-owned subsidiary of Seller.

7.7    **Assumption of Accounts Payable arising after May 31, 2000.** Purchaser shall assume and indemnify Seller for, from and against all accounts payable, debts and obligations of SALV incurred on or after May 31, 2000, and Seller shall indemnify Purchaser for, from and against all accounts payable, debts and obligations of SALV incurred prior to May 31, 2000.

## ARTICLE VIII

### Termination

8.1    **Right to Terminate.** Notwithstanding anything to the contrary contained herein, this Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing: (a) by Purchaser if the conditions precedent set forth in Section 5.1 are not satisfied or waived in writing by Purchaser on or before October 30, 2000; or (b) by Seller if the conditions precedent set forth in Section 5.2 are not satisfied or waived in writing by Seller on or before October 30, 2000.

8.2    **Remedies.** No party shall be limited to the termination right granted in Section 8.1 hereof by reason of the nonfulfillment of any condition precedent to such party's closing obligations or a breach of another party's representations and warranties, but may, in the alternative, elect to do one of the following:

(a)     **Proceed to Close.**  Proceed to Closing despite the nonfulfillment of any condition to its obligation to proceed to Closing, it being understood that consummation of the transactions contemplated herein shall not be deemed a waiver of a breach of any representation, warranty or covenant or of any party's rights and remedies with respect thereto.

(b)     **Decline to Close.**  Decline to proceed to Closing, terminate this Agreement as provided in Section 8.1 hereof, and thereafter seek damages as limited if, and to the extent permitted by, Section 8.3 hereof.

8.3     **Right to Damages.**  If this Agreement is terminated, no party hereto shall have any liability or obligation to the other; provided, however, that each party hereto shall remain liable for any breach of any of that party's representations and warranties or the terms of this Agreement, or any willful failure by the party to perform any of his, her or its obligations or agreements contained in this Agreement, in which case that party shall be liable for all of the other parties' out-of-pocket costs and expenses incurred in connection with the negotiations, due diligence reviews, and preparation of the letter of intent, this Agreement, and all of the other documents related to this transaction, and those costs and expenses incurred by the other party in pursuing such rights and remedies (including reasonable attorneys' fees).

## ARTICLE IX

### INDEMNIFICATION

9.1     **Indemnification by Seller.**  Seller will indemnify, defend and hold harmless Purchaser for, from and against any losses or damages including reasonable attorneys' fees, arising out of or relating to:  (i) any breach of or inaccuracy in any representation or warranty made by the Seller pursuant to this Agreement or any document delivered pursuant to this Agreement; (ii) any failure by the Seller to perform any covenant under this Agreement or any document delivered pursuant to this Agreement; (iii) any and all taxes that have become due and payable during, or which have accrued with respect to the Seller, the Company and SALV for, any period prior to the Closing Date (including any taxes attributable to the operations of the Seller, the Company and SALV payable as a result of an audit of any tax return will be deemed to have accrued in the period to which such taxes are attributable), other than taxes relating to or arising from the Assumed Liabilities; and (iv) all sums expended by Purchaser pursuant to Section 5.2(i) hereof, solely in the event that the approvals required under Section 5.1(c) have not been obtained, and the parties have terminated this Agreement.

9.2     **Indemnification by Purchaser.**  Purchaser will indemnify, defend and hold harmless the Seller for, from and against any losses or damages including reasonable attorneys' fees arising out of or relating to:  (i) any breach of or inaccuracy in any representation or warranty made by Purchaser or Cantelme pursuant to this Agreement or any document delivery pursuant to this Agreement; (ii) any failure by Purchaser or Cantelme to perform any covenant under this Agreement or any document delivered pursuant to this Agreement; and (iii) the business or operation of the Purchaser, the Company or SALV after the Closing Date (other than such matters for which the Seller is responsible hereunder).

9.3    **Notice of Claims.** The indemnified party will promptly, and in any event within 30 days of learning of such matter, notify the indemnifying party in writing of all matters which may give rise to the right to indemnification hereunder. If the indemnifying party does not receive notice of any matter known to the indemnified party and as to which the indemnified party is entitled to indemnification hereunder within such time period, the indemnifying party will not be obligated to indemnify the indemnified party for any increase in the amount of indemnification obligations under this Agreement that the indemnifying party can demonstrate is attributable to the failure of the indemnified party to so notify the indemnifying party within such time period. The indemnified party will have the right: (a) with the consent of each party, which will not be unreasonably withheld or delayed, to settle all indemnifiable matters related to claims by third parties which are susceptible to being settled; and (b) to participate in the defense, through counsel of its own choosing, at its own expense, of any action which may be brought by a third party in connection therewith. Each party will keep each other reasonably informed of the progress of any litigation or settlement negotiations with third parties in connection with a matter indemnified against hereunder. Subject to non-waiver of applicable legal privileges, each party will permit each other reasonable access to books and records and otherwise cooperate with any indemnifiable matter resulting from a claim by a third party.

9.4    **Threshold.** No party to this Agreement shall be entitled to indemnification or any damages resulting from this Agreement until the total amount for which such party shall be entitled to such indemnification exceeds $35,000 in the aggregate. No threshold shall apply in respect of legal fees of the Company payable by Seller under Section 5.1(h) hereof.

## ARTICLE X

### Miscellaneous

10.1    **Fees.** Purchaser and Cantelme, on the one hand, and Seller on the other hand, each represent and warrant to the other that the respective warrantor has not dealt with and is not aware of any dealings with any person, firm or corporation who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment from the other party for arranging these transactions or introducing the parties to each other. Purchaser, Cantelme and Seller shall each be responsible for their own fees and expenses incurred in connection with the negotiation, execution and consummation of this transaction, including, without limitation, legal and accounting fees and expenses.

10.2    **Notices.** All notices required or permitted to be given hereunder shall be in writing and shall be deemed given when delivered in person, or three (3) business days after being placed in the hands of a courier service (e.g., DHL or Federal Express) prepaid or faxed provided that a confirming copy is delivered in person or by courier service forthwith as herein provided, addressed as follows:

If to Purchaser or Cantelme:

SWA, LLC
2398 East Camelback
Phoenix, Arizona 85016

With a copy to:

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Attention: Terence W. Thompson, Esq.
Fax: (602) 530-8500

If to Seller:

Rural/Metro Corporation
Scottsdale, Arizona 85285
8401 East Indian School Road
Scottsdale, Arizona 85251
Attention: General Counsel
Fax: (480) 481-3328

With a copy to:

Greenberg Traurig, LLP
One East Camelback Road, Suite 1100
Phoenix, Arizona 85012-1656
Attention: Robert S. Kant, Esq.
Fax: (602) 263-2350

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 9.2.

10.3   **Entire Agreement.**  This Agreement and the agreements contemplated herein constitute the entire agreement between the parties with respect to the subject matter hereof and shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. Each exhibit and schedule shall be considered incorporated into this Agreement.   This Agreement may not be amended, modified, supplemented or otherwise altered in any respect except by an agreement in writing signed by the parties hereto.   This Agreement supersedes all prior written or oral agreements between Purchaser and Seller.

10.4   **Waivers.**  The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege conferred in this Agreement or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party. A breach of any representation, warranty or covenant shall not be affected by the fact that a more general or more specific representation, warranty or covenant was not also breached.

865530/13101.0001                                          18

10.5    **Facsimile; Counterparts.** This Agreement may be executed by facsimile and/or in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument. If this Agreement is executed by facsimile, then the parties hereto each agree to provide to the other party two (2) original executed signature pages of this Agreement and each other agreement to be delivered at the Closing within five (5) business days following the Closing.

10.6    **Due Diligence Investigation.** Without limiting the representations, warranties, covenants and agreements contained in this Agreement:

(a)    Purchaser and Cantelme acknowledge that as of the date hereof and as of the Closing Date (i) they have had the opportunity to visit with Seller and the Company and meet with their respective officers and representatives to discuss the business and the assets, liabilities, financial condition, cash flow, intellectual property and operations of the Company and SALV, and (b) all materials and information requested by Purchaser and Cantelme have been made available to Purchaser's and Cantelme's reasonable satisfaction;

(b)    Purchaser and Cantelme acknowledge that as of the Closing Date they will have made their independent examination, investigation, analysis, and evaluation of the Company and SALV, including Purchaser's and Cantelme's own estimate of the value of the Company's and SALV's business; and

(c)    Purchaser and Cantelme acknowledge that they have undertaken such due diligence (including a review of the assets, liabilities, books, records and contracts of the Company and SALV) that they deem adequate, including that described above.

10.7    **Severability.** The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

10.8    **Applicable Law.** This agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Arizona without regard to the conflicts of laws principles of such state.

10.9    **Construction.** The parties hereto acknowledge and agree that each party has participated in the drafting of this Agreement and that this document has been reviewed by the respective legal counsel for the parties hereto and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be applied to the interpretation of this Agreement. No inference in favor of, or against, any party shall be drawn from the fact that one party has drafted any portion hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

PURCHASER:

SWA, LLC

By: _____
Name: Patrick Cantelme
Title: Managing Member

SELLER:

RURAL/METRO CORPORATION

By: _____
Name: John S. Banas III
Title: SVP + General Counsel

Patrick Cantelme joins this Agreement solely with respect to Sections 3.2, 4.2, 4.4, 5.1(d) 7.1, 10.1 and 10.6.

_____
Patrick Cantelme

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Escrow Agreement |
| Exhibit B | - | Termination and Assumption Agreement |
| Exhibit C | - | Closing Certificate of Seller |
| Exhibit D | - | Capital Equipment and Vehicle Lease Agreement |
| Exhibit E | - | Licensing Agreement |
| Exhibit F | - | Closing Certificate of Purchaser |
| Exhibit G | - | Non-Competition Letter Agreement |

EX. 2

# LICENSING AGREEMENT

THIS LICENSING AGREEMENT (the "Agreement") is made and entered into as of the 31st day of August, 2000, by and between **RURAL/METRO CORPORATION**, a Delaware corporation ("Licensor"), and **SWA, LLC**, a Nevada limited liability company ("Licensee").

## RECITALS

**A.**     Licensee is engaged in the business of providing emergency and non-emergency medical transportation services (the "Operations").

**B.**     Licensor has the right and authority to license use of certain trademarks, trade names, service marks and other intellectual property which Licensee desires to use in connection with the Operations.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## ARTICLE 1.

## GRANT OF LICENSE

**1.1     License Grant.**

**(a)**     Subject to Article 7 hereof, Licensor hereby grants to Licensee a royalty-free, exclusive and irrevocable right and license to use the name "Rural/Metro of Nevada" for a period of the later of (i) ninety (90) days after the Effective Date or (ii) the thirty (30) days after Purchaser has obtained approval from the City of Las Vegas and Clark County, Nevada with respect to a license to conduct the Operations, solely in connection with the conduct of the Operations in the territory described in Article 2.  Subject to Article 7 hereof, Licensor hereby grants to licensee a royalty-free, exclusive and irrevocable right and license to use the name "Southwest Ambulance" for the duration of the term of this Agreement, solely in connection with the conduct of the Operations in the territory described in Article 2.

**(b)**     Licensor shall use commercially reasonable efforts to protect the Licensed Assets and shall defend, at Licensor's expense, any claims of infringement or unfair competition brought against Licensee in connection with Licensee's proper use hereunder of the Licensed Assets. Licensee shall notify Licensor of the existence of any such claims promptly after being advised thereof. The defense, settlement and handling of such claim for infringement or unfair competition shall be as determined by Licensor in its sole discretion.

**(c)**     The Licensed Assets and any goodwill associated therewith are and shall at all times remain the property of Licensor subject to the Licensing Agreement. All use of any

865538/13101.0001

Licensed Asset by Licensee and all goodwill generated by use of any Licensed Asset shall inure to the benefit of Licensor subject to the Licensing Agreement.

(d)    Licensee shall not contest or challenge the validity of any Licensed Asset or the ownership thereof. Licensor is not granting Licensee any right, title or interest in the Licensed Assets except the right to use the Licensed Assets in compliance herewith.

(e)    Licensee shall use the Licensed Assets at all times solely in connection with the Operations in the territory set forth in Article 2.

(f)    Licensor reserves the right to approve in advance all public uses of the Licensed Assets other than uses of materials prepared by Licensor or previously approved by Licensor.

(g)    In order to preserve the validity and integrity of the Licensed Assets licensed to Licensee hereunder, Licensee hereby grants Licensor the right, at any reasonable time and from time to time, to enter upon any premises owned, leased or controlled by Licensee, to inspect such premises and all of the operations there to ensure that all uses of the Licensed Assets are permissible uses thereof. Licensor may confer with the employees of Licensee after written notice to Licensee, on any premises owned, leased or controlled by Licensee or such other place as agreed to by Licensee, in order to determine the effect of the use of the Licensed Assets on the goodwill associated with the Licensed Assets. Licensee will comply with all requests from Licensor for inspection, samples or other activity in connection with the validity, integrity and use of the Licensed Assets.

(h)    Licensee acknowledges that Licensor and its subsidiaries and affiliates own all right, title and interest in other intellectual property besides the Licensed Assets (the "Licensor's Property"), including, without limitation, the logos related to the name "Southwest Ambulance" set forth on Exhibit 1 hereto. Licensee further acknowledges that this Agreement does not extend to the Licensor's Property and Licensee agrees not to use Licensor's Property in any manner whatsoever and agrees not to take any action that diminishes any of Licensor's right, title and interest in the Licensor's Property.

## ARTICLE 2.

## TERRITORY

The territory within which Licensee may utilize the name "Rural/Metro of Nevada" shall be Clark County, in the State of Nevada. The territory within which Licensee may utilize the name "Southwest Ambulance" shall be the State of Nevada.

## ARTICLE 3.

## QUALITY CONTROL AND SUPERVISION

During the term of this Agreement (including any renewal terms), Licensee will diligently and strictly comply with all standards, specifications, and instructions of Licensor (as same may be amended from time to time) regarding the use of the Licensed Assets.

## ARTICLE 4.

## TERM

The term of this Agreement shall begin as of the date of its execution by both Licensor and Licensee (the "Effective Date") and continue for fifty (50) years, or until terminated pursuant to the terms of this Agreement.  Licensee may terminate this Agreement upon ten (10) days' advanced written notice to Licensor.

## ARTICLE 5.

## ROYALTIES

The license granted hereby is and shall be throughout the term of this Agreement, Licensee shall not pay any royalty fee and no other fee for the use of the Licensed Assets shall be due to Licensor hereunder.

## ARTICLE 6.

## TRANSFER

No transfer or sublicense of any right or interest of Licensee under this Agreement, in whole or, in part (whether voluntarily or by operation of law), directly, indirectly or contingently, shall be permitted without the prior written consent of Licensor, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Licensee may transfer or sublicense any of its rights under this Agreement to an affiliate of Licensee without Licensor's consent; provided that such transferee or sublicensee agrees in writing to be bound by the terms of this Agreement.  Licensor may sell, assign or otherwise transfer its rights to the Licensed Assets, without the consent of Licensee.

## ARTICLE 7.

## TERMINATION

**7.1     Events of Termination.** This Agreement shall terminate automatically upon the occurrence of a Material Breach. It shall be a "Material Breach" if Licensee fails to cure a default within thirty (30) days following receipt of written notice of such default. For purposes of this Agreement, it shall be a default if Licensee:

      **(a)**    conducts any portion of its business or uses any of the Licensed Assets in a manner that Licensor believes threatens the validity or integrity of any of the Licensed Assets or threatens the goodwill associated therewith;

      **(b)**    attempts to transfer an interest in this Agreement in violation of Article 6 of this Agreement;

      **(c)**    fails or refuses to comply with any other provision of this Agreement or any instruction of Licensor concerning use of the Licensed Assets; or

      **(d)**    violates any provision of any other agreement, instrument or document between Licensee, on the one hand, and Licensor or any subsidiary of Licensor, on the other hand.

    **7.2**    **Events of Immediate Termination.** It shall be a Material Breach, and this Agreement shall terminate without further action by Licensee or notice to Licensor, if Licensee:

      **(a)**    . misuses or makes an unauthorized use of any Licensed Asset or commits any act which could reasonably be expected to materially impair the goodwill associated with any Licensed Asset;

      **(b)**    is convicted of or pleads no contest to a felony or is convicted of or pleads no contest to any other crime or offense that Licensor reasonably believes is likely to adversely affect the reputation of Licensor, its goodwill, or the Licensed Assets;

      **(c)**    transfers all or substantially all of its assets to an unaffiliated entity and is not the surviving corporation; or

      **(d)**    defaults (as set forth in Section 7.1 above) more than two times in any twelve-month period; or

      **(e)**    becomes insolvent by reason of an inability to pay debts as they mature or makes an assignment for the benefit of creditors or any admission of inability to pay obligations as they become due.

    In the event of termination under this Section 7.2, Licensee shall not be entitled to cure the matter giving rise to termination.

    **7.3**    **Compliance With Laws.** To the extent that the provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable law, such provisions shall, to the extent such are not in accordance with applicable law, be deemed to be amended to comply with applicable law and Licensee shall comply with applicable law in connection with each of these matters.

7.4     **Effect of Termination.** Upon termination of this Agreement, Licensee shall:

(a)     immediately cease using any advertising materials, signs, sign faces, forms, invoices, or other materials that bear any Licensed Assets;

(b)     discontinue use of any Licensed Assets, and any colorable imitation thereof, in any manner or for any purpose, and discontinue utilizing for any purpose any Licensed Assets or other mark that suggests or indicates a current or prior connection or association with Licensor or its affiliates;

(c)     promptly take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to Licensee's use of any Licensed Asset; and

(d)     furnish to Licensor within thirty (30) days after the effective date of termination, evidence satisfactory to Licensor of Licensee's compliance with the foregoing obligations.

7.5     **Survival.** All obligations of Licensor and Licensee that expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

## ARTICLE 8.

## MISCELLANEOUS

8.1     **Independent Contractor.** The parties hereto are independent and nothing herein shall be construed or deemed to create a joint venture, contract of employment or partnership.

8.2     **Headings.** Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.3     **Entire Agreement; Modification.** This Agreement contains the complete expression of the Agreement between the parties with respect to the matters addressed herein and there are no promises, representations, or inducements except as herein provided. The terms and provisions of this Agreement may not be modified, supplemented or amended except in writing signed by both parties hereto. All terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective, permitted successors and assigns of the parties hereto.

8.4     **No Waiver.** Failure by either party hereto to enforce at any time or for any period of time any provision or right hereunder shall not constitute a waiver of such provision or of the right of such party thereafter to enforce each and every such provision.

8.5     **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of Arizona, notwithstanding the conflict of law principals of such state. The prevailing party in any litigation concerning this Agreement shall be entitled to

reimbursement of its reasonable costs, including legal and accounting fees, incurred in connection with any such matter.

**8.6    Counterparts.** This Agreement may be executed in any number of counterparts, all of which together with constitute one agreement binding on the parties hereto.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the date first above written.

**LICENSOR:**

RURAL/METRO CORPORATION, a Delaware corporation

By: _____
Name: _JOHN S. BANAS III_
Title: _SVP + GENERAL COUNSEL_

**LICENSEE:**

SWA, LLC, a Nevada limited liability company

By: _____
Name: _Patrick Cantelme_
Title: _Managing Member_

*Ex.3*

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K/A

(AMENDMENT NO. 1)

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

#### FOR THE FISCAL YEAR ENDED JUNE 30, 2002

*COMMISSION FILE NUMBER 0-22056*

# RURAL/METRO CORPORATION

(Exact name of registrant as specified in its charter)

```
        DELAWARE                                    86-0746929
(State or Other Jurisdiction of                 (I.R.S. Employer
 Incorporation or Organization)                  Identification
 No.)
```

#### 8401 EAST INDIAN SCHOOL ROAD, SCOTTSDALE, ARIZONA 85251
(Address of principal executive offices) (Zip Code)

### REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (480) 994-3886

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: NONE

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

#### COMMON STOCK, PAR VALUE $.01 PER SHARE
#### PREFERRED STOCK PURCHASE RIGHTS
(Title of Class)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

AS OF OCTOBER 24, 2002, THE AGGREGATE MARKET VALUE OF THE VOTING STOCK HELD BY NON-AFFILIATES OF THE REGISTRANT, COMPUTED BY REFERENCE TO THE CLOSING SALES PRICE OF SUCH STOCK AS OF SUCH DATE ON THE NASDAQ SMALLCAP MARKET, WAS $31,750,078 SHARES OF COMMON STOCK HELD BY EACH OFFICER AND DIRECTOR AND BY EACH PERSON WHO OWNED 5% OR MORE OF THE OUTSTANDING COMMON STOCK HAVE BEEN EXCLUDED IN THAT SUCH PERSONS MAY BE DEEMED TO BE AFFILIATES. THIS DETERMINATION OF AFFILIATE STATUS IS NOT NECESSARILY CONCLUSIVE.

As of October 24, 2002, there were 16,138,195 shares of the registrant's Common Stock outstanding.

#### DOCUMENTS INCORPORATED BY REFERENCE
NONE

 2002, EDGAR Online, Inc.

## OUR CURRENT SERVICE AREAS

We currently provide our services in approximately 400 communities in the following 26 states and the District of Columbia:

| | | | |
|---|---|---|---|
| Alabama | Iowa | New York | Tennessee |
| Arizona | Kentucky | North Dakota | Texas |
| California | Louisiana | Ohio | Virginia |
| Colorado | Maryland | Oregon | |
| Washington | | | |
| Florida | Mississippi | Pennsylvania | Wisconsin |
| Georgia | Nebraska | South Carolina | |
| Indiana | New Jersey | South Dakota | |

We provide ambulance services in each of these states, including the District of Columbia, primarily under the names Rural/Metro Ambulance or Rural/Metro Medical Services and in certain areas of Arizona under the name Southwest Ambulance, except in Oregon, North Dakota and Wisconsin where we exclusively provide fire protection services. We also operate under other names depending upon local statutes or contractual agreements. We provide fire protection services under the name Rural/Metro Fire Department in 12 states, and in Oregon also under the name Valley Fire Services.

We generally provide our ambulance services pursuant to a contract or certificate of necessity on an exclusive or nonexclusive basis. We provide 911 emergency ambulance services primarily pursuant to contracts or as a result of providing fire protection services. In certain service areas, we are the only provider of both emergency ambulance and non-emergency ambulance services. In other service areas, we compete for non-emergency ambulance contracts.

## MEDICAL TRANSPORTATION SERVICES

### EMERGENCY AMBULANCE SERVICES

We generally provide emergency ambulance response and medical transportation services pursuant to contracts with counties, fire districts, and municipalities. These contracts typically appoint us as the exclusive provider of 911 emergency ambulance services in designated service areas and require us to respond to every 911 emergency medical call in those areas. The level of response to the call is dependent upon the underlying contract. We typically respond to virtually all 911 calls with Advanced Life Support (ALS) ambulance units, unless otherwise specified by contract.

ALS ambulances are staffed with either two paramedics or one paramedic and an emergency medical technician (EMT) and are equipped with ALS equipment (such as cardiac monitors, defibrillators, advanced airway equipment and oxygen delivery systems) as well as pharmaceuticals and medical supplies.

Upon arrival at an emergency, the ALS crew members deploy portable life support equipment, ascertain the patient's medical condition, and, if required, administer advanced life support techniques and procedures that may include tracheal intubation, cardiac monitoring, defibrillation of cardiac arrhythmias, and the administration of medications and intravenous solutions under the direction of a physician. The crew also may perform Basic Life Support (BLS) services, which include cardiopulmonary resuscitation (CPR), basic airway management, and basic first aid including splinting, spinal immobilization, recording of vital signs and other non-invasive procedures. As soon as medically appropriate, the patient is placed on a portable gurney and transferred into the ambulance. While one crew member monitors and treats the patient, the other crew member drives the ambulance to a hospital designated either by the patient or the applicable medical protocol. While on scene or en route, the ambulance crew alerts the hospital regarding the patient's medical condition, and if necessary, the attending ambulance crew member seeks advice from an emergency physician as to treatment. Upon arrival at the hospital, the patient generally is taken to the emergency department where care is transferred to the emergency department staff.

### NON-EMERGENCY AMBULANCE SERVICES

We also provide ambulance services to patients requiring either advanced or basic levels of medical supervision and treatment during transfer to and from residences, hospitals, long-term care centers, and other health care facilities. These services may be provided when a home-bound patient requires examination or treatment at a health care facility or when a hospital inpatient requires tests

7

 2002. EDGAR Online, Inc.

Ex. 4



# *Southwest Ambulance - Las Vegas*



*Locally owned and operated*





Home

About us

Services

Leading the way

Employment

Links

Employee Intranet

# Welcome to Southwest Ambulance - Las Vegas!

Southwest Ambulance - Las Vegas began serving Southern Nevada on November 11, 2000. Our team of caring professionals are providing emergency and non emergency 911, non-emergency ALS and BLS transports and CCT - critical care nurse transport ambulance care.

## Location

**Southwest Ambulance - Las Vegas**
**4640 South Arville, Suite G**
**Las Vegas, Nevada**
**89103**
Office: **702-650-9900**
Fax: **702-650-3330**

Non-Emergency
Ambulance & CCT
Dispatch:
**702-792-9111** or
**702-SWA-9111**

Hello, you are visitor  since February 13, 2002

Welcome to Southwest Ambulance-Las Vegas.
This site is maintained by Todd Allen. If any questions or problems encountered, feel free to contact.





# About Us

## Our History:

Southwest Ambulance - Las Vegas was formed in March 1999. Our goal is to provide exceptional patient care, empower our team of healthcare professionals to exceed customer expectations of performance and reduce service rates to the consumer through quality competition.

Southwest Ambulance received approval to negotiate franchise agreements with Clark County and the Cities of Las Vegas and North Las Vegas in February 2000 and service begins November 11, 2000. 911 non emergency service began on March 18, 2001 and full 911 services began on April 15, 2001.

Southwest Ambulance's every action is focused on providing the best personnel, the best service and the best price because simply, "We Care."

**Presently -**

Southwest Ambulance - Las Vegas has grown to employee over 115 full time employees and over 50 part time employees.

*"Operationally, we have overcome most of our growing pains and we still continue to make strides in our daily efforts to maintain our status as Southern Nevada's premier pre-hospital care providers."* Brian Rogers, Managing Director.





Home

About us

Services

Leading the way

Employment

Links

# Services

## Ambulance Services

**Emergency services:**
Advanced and intermediate response to 911
emergency calls for service.

**Non-Emergency Services:**
Basic and Advanced Life Support for patients
requiring supervised medical transportation.

**Critical Care Transport:**
Interfacility specialized nursing transport services
for patients requiring the highest level of care.

**Special Events Coverage:**
Comprehensive medical care for concerts,
sporting events, large gatherings and conventions.

**Community Awareness:**
To local schools and other organizations to
educate the public to what services Paramedics
and Emergency Medical Technicians provide on a
daily basis.

"*Our goal is to provide members of the
community with the basic first aid knowledge
they need and to teach children to call 911*
Cathy Hayes, Director of Employee and Public
Relations.





# Setting Ourselves Apart

By choosing Southwest Ambulance - Las Vegas, patients, their families and healthcare facilities will know they are getting the most rapid, caring and affordable ambulance service in town. Southwest's team of caring professionals tailor their actions to meet the special needs of every patient and their family.

Local owner/operators, Sharon Henry and John Wilson, are always available to insure Southwest Ambulance is responsive to the dynamic needs of our community.

Local owners mean local decision making and strong ties to local healthcare providers. We are able to change quickly based on the needs of our patients and customers.

As Las Vegas' hometown ambulance company, we focus on purchasing goods and services from local vendors with a special emphasis on minority and women owned businesses.

*"Clinically, our goal is simple.  To provide superior patient care and customer service at all times."* said Pete Carlo. *"We provide continuing medical education which will challenge all pre-hospital providers to be the best they can be."*





**Home**

**About us**

**Services**

**Leading the way**

**Employment**

**Links**

*New Online Letter of Interest Form.

# Employment

## Southwest wants YOU!

If you care as much as "We Care," we want you. Southwest is looking for individuals with a positive and compassionate attitude who will ALWAYS provide exceptional care in everything they do.

Call our office at (702) 650-9900 or complete our Online Interest Application for more information on our competitive wages and our benefits package that includes full medical, dental, 401k, life insurance and disability coverage.

## Positions Available

EMT-Basic (on ambulance)
EMT-Intermediate
Paramedic
Dispatch
EMS-RN
Supply Technicians
Billing Office Personnel

*For information on EMS training, reciprocity or local protocols and procedures contact the Clark County Health Department at (702) 383-1381.

**Southwest Ambulance promotes a drug and alcohol free environment. "We Care" about our patients and our partners, so for their safety, we test.**





## Fire Departments

Boulder City Fire Department
Clark County Fire Department
Las Vegas Fire and Rescue
Henderson Fire Department
Mesquite Fire Department
North Las Vegas Fire Department

## Police

Las Vegas Metropolitan Police Department
Las Vegas Metropolitan Police Department Search
and Rescue

## EMS Links

FireTimes.com - Fire, EMS and Ambulance Industry
News and Features.
Mercy Air - Air Transport that services Clark County.
EMT Sparky - Clark County EMS Protocols for your
PDA.
Battle Born C.I.S.M. Training - Nevada Based Critical
Incident Stress Management with links to national
training as well.

$Ex.5$



**LEWIS AND ROCA** — LLP — **L A W Y E R S**

| Phoenix Office | Tucson Office | Las Vegas Office |
|---|---|---|
| 40 North Central Avenue | One South Church Avenue | 3993 Howard Hughes Parkway |
| Phoenix, Arizona 85004-4429 | Suite 700 | Suite 600 |
| Telephone (602) 262-5311 | Tucson, Arizona 85701-1611 | Las Vegas, Nevada 89109 |
| Facsimile (602) 262-5747 | Telephone (520) 622-2090 | Telephone (702) 949-8200 |
| | Facsimile (520) 622-3088 | Facsimile (702) 949-8398 |

Jennifer A. Van Kirk
Direct Dial: (602) 262-0203
Direct Fax: (602) 734-3885
E-Mail: JVanKirk@lrlaw.com
Admitted in Arizona and Illinois

Our File Number 42005-00002

November 20, 2002

*VIA FACSIMILE AND FEDERAL EXPRESS*

Mr. Patrick Cantelme
Mr. Robert E. Ramsey
SWA, LLC
2398 East Camelback Road
Phoenix, Arizona 85016

Re: Trademark License between Rural/Metro Corp. and SWA, LLC

Dear Mr. Cantelme and Mr. Ramsey:

This firm serves as intellectual property counsel for Rural/Metro Corporation. As owner of the valuable SOUTHWEST AMBULANCE trademark and SW+ logo, Rural/Metro actively polices the use of these marks by third parties. Our client has become increasingly concerned about your use of the SOUTHWEST AMBULANCE mark beyond the intended and express scope of your license and your unauthorized use of its SW+ logo.

This letter serves as notice of your default under the License Agreement entered into by our client and SWA, LLC on August 31, 2000. You have 30 days – until December 26, 2002[1] – to cure this default. If you fail to cure within 30 days, your default becomes a Material Breach and the License will automatically terminate. Article 7.1 ("This Agreement shall terminate automatically upon the occurrence of a Material Breach.").

Our investigation indicates you have committed default and/or Material Breach under the License by:

- Using a knockoff SW+ logo;
- Using the SOUTHWEST AMBULANCE mark outside Nevada;
- Registering the trade name SOUTHWEST AMBULETTE in Arizona; and
- Registering the *www.southwestambulance.com* domain name.

---

[1] Under Article 10.2 of the Stock Purchase Agreement, notice is deemed given three (3) business days after sent via Federal Express or facsimile.

1304125.1



November 20, 2002                Page 2

First, your use of the knockoff SW+ logo shown below is a default under the License and infringes Rural/Metro's trademark rights in its SW+ logo.

        

**Rural/Metro SW+ Logo**                **Knockoff SW+ Logo**

Rural/Metro owns the SW+ logo, as SWA explicitly acknowledged in the License: "Licensee acknowledges that Licensor and its subsidiaries and affiliates own all right, title and interest in other intellectual property . . . including, without limitation, the logos related to the name 'Southwest Ambulance.'" License Article 1.1(h). SWA also explicitly agreed it would not use the SW+ logo "in any manner whatsoever" and agrees "not to take any action that diminishes any of Licensor's right, title and interest in the Licensor's Property." Article 1.1(h). SWA's use of the knockoff SW+ logo clearly violates these provisions of the License, and thus, is a default under the License. Article 7.1(c) (defining breach as "fail[ing] or refus[ing] to comply with any other provision of this Agreement"). You must cease all use of the knockoff SW+ logo within 30 days or you will be in "Material Breach" of the License. Article 7.1 ("It shall be a 'Material Breach' if Licensee fails to cure a default within thirty (30) days following receipt of written notice of such default.")

Second, you are using the SOUTHWEST AMBULANCE mark outside the state of Nevada. In fact, you have solicited Rural/Metro employees in Arizona using the SOUTHWEST AMBULANCE mark. Your office on Camelback Road in Phoenix uses the SOUTHWEST AMBULANCE mark. Your website, which prominently uses the mark, is accessible to consumers outside Nevada. Further, you have registered the trade name SOUTHWEST AMBULETTE in Arizona. Each of these actions is a separate default under the License, which limits your use of the SOUTHWEST AMBULANCE name to Nevada. Article 2 ("The territory within which Licensee may utilize the name 'Southwest Ambulance' shall be the State of Nevada."). Unless you stop all use of the SOUTHWEST AMBULANCE mark outside Nevada within thirty (30) days, you will be in Material Breach of the License. Article 7.1 ("It shall be a 'Material Breach' if Licensee fails to cure a default within thirty (30) days following receipt of written notice of such default.")

Also, SWA, LLC's sister company, SALV, has registered the domain name *www.southwestambulance.com.* SALV does not have the right to use the SOUTHWEST AMBULANCE mark and its use of the domain constitutes trademark infringement and cybersquatting. To the extent it registered the domain name on behalf of SWA, doing so is an unauthorized use of the SOUTHWEST AMBULANCE trademark. As such, it is a Material

Breach of the License. Unless you transfer the *www.southwestambulance.com* domain name to Rural/Metro immediately, this Material Breach will terminate the License and with it, SWA's limited right to use the SOUTHWEST AMBULANCE mark.

Finally, Rural/Metro demands that you begin using the phrase LAS VEGAS immediately after all use of the SOUTHWEST AMBULANCE mark. Failing to do so will place you in further default under the License. Article 7.1(c) (default defined as "fail[ing] or refus[ing] to comply with . . . any instruction of Licensor concerning use of the Licensed Assets").

In sum, you are in default and/or Material Breach of the License Agreement because of your (1) unauthorized use of the SW+ logo, (2) your use of the SOUTHWEST AMBULANCE mark outside the state of Nevada, (3) registration of the trade name SOUTHWEST AMBULETTE in Arizona, and (4) your registration and use of the domain name *www.southwestambulance.com.* If you do not cure these defaults by December 26, 2002, you will be in Material Breach and the License will automatically terminate.

Sincerely,

Jennifer A. Van Kirk

JAV/jab

cc:  Gallagher & Kennedy, P.A.
     Attn: Terence W. Thompson, Esq.

1334125.1

Ex. 6

**GALLAGHER & KENNEDY**
—————— P.A. ——————
ATTORNEYS AT LAW

BRIAN W. LaCORTE
DIRECT DIAL: (602) 530-8020
E-MAIL: BWL@GKNET.COM

2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
PHONE: (602) 530-8000
FAX: (602) 530-8500
WWW.GKNET.COM

December 4, 2002

## OFFER OF COMPROMISE PURSUANT TO F.R.E. 408

VIA FACSIMILE AND HAND DELIVERY

Jennifer A. Van Kirk
Lewis and Roca, L.L.P.
40 North Central Avenue
Phoenix, AZ 85004-4429

Re:    Rural Metro Corporation/SWA, LLC

Dear Ms. Van Kirk:

This law firm represents SWA, LLC ("SWA"). On behalf of our client, I write in response to your November 20, 2002 correspondence and "notice of default."

Our client takes issue with the assertions raised in your correspondence. Our client disputes your "investigation" and Rural Metro Corporation's ("Rural Metro") allegations of default. In response to the points raised in your correspondence, we provide the following factual background and analysis.

### Factual Background

On August 31, 2000, Rural Metro and SWA entered into a Stock Purchase Agreement under which SWA purchased all right, title and interest in Rural Metro of Nevada, Inc. At the time of purchase, SWA adopted the trade name "Southwest Ambulance of Nevada, Inc." As part of the stock purchase, SWA entered into a Trademark License Agreement ("License") wherein SWA received a royalty-free, exclusive and irrevocable right and license to use the name "Southwest Ambulance" for the term of 50 years for the territory of Nevada.

Contemporaneous with the closing of this sale, and in response to concern by public officials in Las Vegas over the appearance of the logo used by Rural Metro in Nevada, SWA adopted a new logo in furtherance of use of the licensed trademark "Southwest Ambulance." The new logo employed a distinctive SW combination with use of a white cross and three-dimensional imaging. SWA's adoption of the logo was open, obvious and known to Rural

Jennifer A. Van Kirk
December 4, 2002
Page 2

Metro. Since adoption of the new logo in the summer of 2000, SWA has continuously, openly and obviously used the logo to operate its ambulance services in the State of Nevada.

At the time of closing, the Agreement set out joint obligations of the parties, in particular stating:

> 4.4(a)  **Notice.** Each party shall promptly give the other party written notice of the existence or occurrence of any condition that would make any representation or warranty of the notifying party untrue or that might reasonably be expected to prevent the consummation of the transactions herein contemplated.

At the time of closing, Rural Metro had every reason to know of SWA's adoption of the new logo. Rural Metro freely entered the Stock Purchase Agreement and License without objecting to or otherwise noting any concern associated with SWA's new logo in Nevada. Since the closing date of the stock purchase, August 31, 2000, Rural Metro has never objected to SWA's use of its new logo. Thus, for a period of at least 27 months Rural Metro has allowed, without objection, the SWA logo to peacefully exist in the State of Nevada.

Since adoption of its logo, SWA has received no indication of actual confusion in any context, particularly in the context of Rural Metro's Arizona operations. Since adoption of its logo, SWA has exclusively offered its services under the licensed mark and logo without interruption, objection or interference. SWA only operates its business services in connection with the licensed mark and logo within the State of Nevada.

Rural Metro, by virtue of municipal regulatory requirements for the provision of emergency medical ambulatory services, cannot operate within the State of Nevada under its current logo or any other logo. Likewise, SWA or any of its affiliates cannot provide services which compete with Rural Metro within the State of Arizona, absent municipal government approval. SWA seeks no such approval and has operated exclusively within the State of Nevada in connection with its licensed mark and logo.

Since the closing of the Stock Purchase Agreement, SWA has performed its obligations in all respects. Prior to your correspondence, SWA has heard nothing from Rural Metro regarding any alleged default or violation of the relevant agreements in connection with SWA's long time use of its distinctive logo or otherwise.

SWA, through its affiliates, does business as "Southwest Ambulance of Las Vegas." Because its offices are in Phoenix, the title of its business is contained on the doors to its Phoenix office. SWA has not used the term "Southwest Ambulance" alone or its logo in any operations in Arizona. Likewise, SWA is aware of no efforts to recruit Rural Metro employees from Arizona or elsewhere. To SWA's knowledge, no Rural Metro employees from Arizona have

1064999/13101.0001

Jennifer A. Van Kirk
December 4, 2002
Page 3

been hired by SWA other than the mutually agreed upon transition of certain Rural Metro
employees to SWA following closing of the stock sale.

In June of 2000, again prior to the closing of the Stock Purchase Agreement, SWA
reserved and registered the domain name "www.southwestambulance.com." To SWA's
knowledge, Rural Metro never objected over the last two and one-half years to SWA's open and
notorious website utilizing this web address. SWA's website does not solicit or otherwise
market services other than to promote that SWA provides services within the State of Nevada
under its exclusive territory. Neither the Stock Purchase Agreement nor the License prohibit use
of the term "Southwest Ambulance" for an Internet domain name or website to promote the
provision of emergency and non-emergency medical transportation services, which SWA
promotes on its website in the context of services in Nevada.

### Analysis

As stated, our client takes issue with the assertions stated in your correspondence. Our
client adamantly contends that it is not using a "knockoff" of Rural Metro's logo, nor is it in
default of the License. Several reasons support this position.

First, SWA adopted its logo prior to the closing of the transaction and in an open and
obvious manner. SWA undertook specific efforts to distinguish its logo from Rural Metro's
previous logo because of public concern over the appearance of Rural Metro's design. For well
over two years, Rural Metro has been aware of SWA's use of its logo, and has remained silent
regarding such use. Rural Metro sat on its hands.

Likewise, SWA has openly and obviously used its Internet website under the domain
name and web address www.southwestambulance.com. Over the last two and one-half years,
Rural Metro remained silent regarding SWA's website.

Rural Metro's conduct clearly implies consent and acquiescence to SWA's open and
obvious use of the now objectionable logo and web address. In fact, the continuous business
dealings between the parties leaves Rural Metro without a legitimate excuse for its failure to act
or object. *See Westinghouse Electric Corp. v. General Circuitbreaker & Electrical Supply, Inc.*,
106 F.3d 894 (9th Cir. 1997) ( implied consent from affirmative conduct results in acquiescence
where litigants have been engaged in continuous business dealings and where trademark owner
impliedly encouraged use of the accused mark over a significant period of time).

Second, use of the respective logos presents zero probability of confusion. The logos are
distinct in a number of ways. The Rural Metro logo uses a vertical combination of letters S and
W with a dark colored X. The presentation of S in the Rural Metro logo is in a block form with
an extended upper stem that combines with the shape of the letter W. On the other hand, the

Jennifer A. Van Kirk
December 4, 2002
Page 4

SWA logo is presented in an angle format with three dimensional graphics. The SWA logo uses a white cross and a completely distinct letter S with fanciful curves and distinctive typeface.

Moreover, the two logos are used in completely separate jurisdictions that make a consumer's encounter of both logos impossible. Those receiving emergency medical transport in Nevada do not encounter Rural Metro's logo, and, likewise, those receiving emergency medical transport in Arizona do not encounter SWA's logo. The nature of trademarks associated with providing emergency medical transportation services is uniquely local to the jurisdiction within which such services are authorized by the relevant governmental authorities. Perhaps for this reason, Rural Metro has never sought federal registration of its mark. In any event, its common law rights would be limited in scope to the territories within which it is authorized to operate.

Indeed, Rural Metro can hardly complain of the potential for confusion when it licensed use of "Southwest Ambulance" in one territory while at the same time it apparently reserved the right to use a logo attributed with the same words in other territories.

Finally, SWA is aware of absolutely no actual confusion among consumers. Brand name identity may have little relevance to a consumer's use of a particular emergency medical transportation service. Only a certain number of services are authorized in a particular jurisdiction, and those services respond to 911 emergency calls. It can hardly be said that a consumer chooses which ambulance will respond to a 911 emergency call. Noticeably absent from your correspondence is any specific reference to any actual confusion. SWA believes none exists.

Accordingly, SWA contends that it is not in breach of licensing provisions which preclude use of Rural Metro's logo. SWA has taken no action to employ the specific Rural Metro logo or otherwise "diminish" Rural Metro's rights in its logo (the language from the License cited in your correspondence relates more to trademark dilution than the confusing similarity asserted by Rural Metro). SWA is not aware of any use of the licensed mark outside the State of Nevada. SWA's web address does not cause confusion nor constitute trademark infringement in violation of the licensed grant in the territory of Nevada.

Rural Metro's complete and utter failure to object to SWA's logo or web address over the last two and one-half years is unsupported by any legitimate business reason or excuse. Rural Metro is estopped as a matter of trademark and contract law from asserting the defaults alleged in your correspondence.

## Proposal

Notwithstanding SWA's meritorious position, SWA is willing to compromise these disputed claims as follows:

1064999/13101.0001

Jennifer A. Van Kirk
December 4, 2002
Page 5

1. SWA or its affiliates will forego use of any reference to the term "Southwest Ambulance" for its services except those within the territory of Nevada. SWA is unaware of any asserted uses outside the State of Nevada and therefore invites discussion of the same.

2. SWA or its affiliates will modify its domain name and web address, if possible, to the domain name www.southwestambulancenevada.com" or www.southwestambulancelasvegas.com.

3. SWA or its affiliates will agree to refrain from use of the title or term "Southwest Ambulance" alone without the words "of Las Vegas" or "of Nevada" when identifying its business at its Phoenix, Arizona office location.

4. SWA or its affiliates will forego use of the mark "Southwest Ambulette" in any state other than Nevada and abandon the Arizona trade name registration for the same.

5. SWA and its affiliates will require an appropriate release of the claims stated in your correspondence and a letter withdrawing the default notice.

Please contact me within ten days from the date of this letter regarding your client's response. Absent a resolution of these disputes, our client will take all appropriate measures, including vigorous defense of and assertion of counterclaims in the litigation in Cause No. 02-CV-2342. We look forward to your reply.

Very truly yours,

GALLAGHER & KENNEDY, P.A.

By:

Brian W. LaCorte
For the Firm

BWL:sc

1064999/13101.0001

Jennifer A. Van Kirk
December 4, 2002
Page 6

bcc:  Pat McGroder

1064999/13101.0001

*Ex. 7*



**LEWIS**
**AND**
**ROCA**
— LLP —
**LAWYERS**

Phoenix Office
40 North Central Avenue
Phoenix, Arizona 85004-4429
Telephone (602) 262-5311
Facsimile (602) 262-5747

Tucson Office
One South Church Avenue
Suite 700
Tucson, Arizona 85701-1611
Telephone (520) 622-2090
Facsimile (520) 622-3088

Las Vegas Office
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89109
Telephone (702) 949-8200
Facsimile (702) 949-8398

Jennifer A. Van Kirk
Direct Dial: (602) 262-0203
Direct Fax: (602) 734-3885
E-Mail: JVanKirk@lrlaw.com
Admitted in Arizona and Illinois

Our File Number 42005-00002

December 12, 2002

**RECEIVED**

**DEC 1 2 2002**

**GALLAGHER & KENNEDY**

Brian W. LaCorte, Esq
Gallagher & Kennedy P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225

Re:    Rural/Metro Corp. v. SWA, LLC

Dear Brian:

We have received your letter of December 4, 2002 and have forwarded it to our client. Your client's "Offer of Compromise" does not alleviate Rural/Metro's concerns. In fact, it fails to even address your client's use of the knockoff SW+ logo. Rural/Metro's notice of default is ongoing and continuing.

To bring itself within compliance with the License, your client must – by December 26, 2002 – do the following:

- Stop all use of the knockoff SW+ logo;

- Stop all use of the SOUTHWEST AMBULANCE mark and name outside Nevada, including on the *www.southwestambulance.com* website;

- Stop all use of the SOUTHWEST AMBULETTE mark;

- Cancel its Arizona trade name registration for SOUTHWEST AMBULETTE; and

- Transfer the *www.southwestambulance.com* domain name to Rural/Metro;

Unless your client abides by each and every demand above, your client's right to use the SOUTHWEST AMBULANCE mark will cease on December 26, 2002. Any further use of the mark will infringe upon Rural/Metro's rights in that mark and will be dealt with accordingly.

Sincerely,

Jennifer A. Van Kirk

JAV/jab

cc: Rural/Metro Corp.

1352180 1

*Ex. B*

# GALLAGHER & KENNEDY

P.A.

### ATTORNEYS AT LAW

BRIAN W. LaCORTE
DIRECT DIAL: (602) 530-8020
E-MAIL: BWL@GKNET.COM

2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
PHONE: (602) 530-8000
FAX: (602) 530-8500
WWW.GKNET.COM

December 19, 2002

VIA FACSIMILE AND U.S. MAIL

Jennifer A. Van Kirk
Lewis and Roca, L.L.P.
40 North Central Avenue
Phoenix, AZ 85004-4429

Re:    Rural Metro Corporation/SWA, LLC

Dear Ms. Van Kirk:

This letter follows our recent telephone conversation of December 17, 2002 regarding Rural Metro Corporation's ("Rural Metro") notice of default. During the conversation, I asked you to discuss with your client whether certain restrictions could be put in place regarding the use by SWA, LLC ("SWA") or its affiliates of the logo in issue. As you know, by the terms of Rural Metro's requested deadline of December 26, 2002, this issue is extremely time sensitive.

Having not heard any response from you regarding your client's position, or response to any of the other matters we discussed on December 17, 2002, we assume that Rural Metro is unwilling to negotiate over potential restrictions concerning the logo. We also understood that you believe Rural Metro would be unwilling to discuss any potential logo restrictions other than a complete cessation of all use.

SWA believes Rural Metro's acquiescence to the new logo strongly supports SWA's argument that no default has occurred. Rural Metro will have a serious problem overcoming SWA's laches arguments. Our investigation continues to confirm that Rural Metro knew of SWA's adoption of the new logo at the time Rural Metro controlled the Las Vegas operations, and did nothing until now – over two years later. We incorporate the positions stated in its December 4, 2002 correspondence.

In any event, by this letter, SWA hereby provides a proposed cure for the alleged default. By doing so, SWA does not admit to or agree with Rural Metro's positions regarding whether a default occurred. SWA is agreeable to adopting a new logo which is completely distinct from

1069447/13101.0001

Jennifer A. Van Kirk
December 19, 2002
Page 2

the logo used by Rural Metro. SWA will require 90 days within which to transition to the new
logo and phase out the existing logo. During such time, SWA will secure a new logo design,
affix the new logo to its ambulances and make necessary changes to various company related
materials.

Because SWA changed its website to address Rural Metro's concerns and because SWA
does not otherwise use the words "Southwest Ambulance" outside of Arizona, we trust that the
changes implemented in the SWA website address Rural Metro's alleged default.

Finally, because SWA does not and cannot control transfer of trademark rights to the
mark "Southwest Ambulette" to Rural Metro, SWA cannot legitimately be expected to "cure"
any alleged default from another party's use of this unrelated mark.

Please advise by close of business tomorrow whether these proposed actions resolve your
client's concerns. Again, I reiterate that our client steadfastly denies that it is in default of the
relevant License. The action proposed above constitutes an attempt to avoid the cost and
expense of litigation over this dispute. I look forward to hearing from you tomorrow regarding
Rural Metro's position.

Very truly yours,

GALLAGHER & KENNEDY, P.A.

By:

Brian W. LaCorte
For the Firm

BWL:sc

1064999/13101.0001